107 T.C. No. 6


UNITED STATES TAX COURT


HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10663-91, 13074-91      Filed September 12, 1996.
            28588-91,  6351-92.



        Ps own, operate, and manage hospitals and related
businesses.  For taxable year ended 1987, pursuant to
sec. 448, I.R.C., Ps not already using an overall
accrual method changed their method of accounting to
that method.  Also during 1987, HCAII, a wholly owned
subsidiary of HCA, sold all of the stock of some
subsidiaries that owned and operated hospitals and
other facilities.  On audit, R determined that for
certain of those subsidiaries (Category B Corporations)
Ps had to include in income for taxable year ended 1987
the entire sec. 481, I.R.C., adjustment relating to the
change in method of accounting required by sec. 448,
I.R.C.  Ps contend that, even though the Category B
Corporations were sold during 1987, pursuant to sec.
448(d)(7)(C)(ii), I.R.C., HCA is entitled to include
ratably in income over a 10-year period the portion of
the sec. 481(a), I.R.C., adjustment attributable to the

Category B Corporations.

    <u>Held</u>: The cessation of trade or business provision of sec. 1.448-1(g)(3)(iii), Income Tax Regs., is a permissible construction of sec. 448(d)(7)(C)(ii), I.R.C.

    <u>Held further</u>: the entire balance of the sec. 481(a), I.R.C., adjustment attributable to the Category B Corporations must be included in Ps' income for taxable year ended 1987.

<u>N. Jerold Cohen</u>, <u>Randolph W. Thrower</u>, <u>J.D. Fleming, Jr.</u>, <u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Reginald J. Clark</u>, <u>Amanda B. Scott</u>, <u>Walter T. Henderson, Jr.</u>, <u>William H. Bradley</u>, and <u>John W. Bonds, Jr.</u>, for petitioners in docket No. 10663-91.

<u>N. Jerold Cohen</u>, <u>Randolph W. Thrower</u>, <u>J.D. Fleming, Jr.</u>, <u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Reginald J. Clark</u>, <u>Amanda B. Scott</u>, <u>Walter T. Henderson, Jr.</u>, <u>William H. Bradley</u>, <u>John W. Bonds, Jr.</u>, and <u>Daniel R. McKeithen</u>, for petitioners in docket No. 13074-91.

<u>N. Jerold Cohen</u>, <u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Amanda B. Scott</u>, <u>Reginald J. Clark</u>, <u>Randolph W. Thrower</u>, <u>Walter T. Henderson, Jr.</u>, and <u>John W. Bonds, Jr.</u>, for petitioners in docket No. 28588-91.

<u>N. Jerold Cohen</u>, <u>Reginald J. Clark</u>, <u>Randolph W. Thrower</u>, <u>Walter T. Henderson, Jr.</u>, and <u>John W. Bonds, Jr.</u>, for petitioners in docket No. 6351-92.

<u>Robert J. Shilliday, Jr.</u>, <u>Vallie C. Brooks</u>, and <u>William B. McCarthy</u>, for respondent.

WELLS, <u>Judge</u>:  These cases were consolidated for purposes of

trial, briefing, and opinion and will hereinafter be referred to as the instant case. Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax as shown below.

| TYE | Deficiency |
|------|------------|
| 1978 | $2,187,079.00 |
| 1980 | 388,006.58 |
| 1981 | 94,605,958.92 |
| 1982 | 29,691,505.11 |
| 1983 | 43,738,703.50 |
| 1984 | 53,831,713.90 |
| 1985 | 85,613,533.00 |
| 1986 | 69,331,412.00 |
| 1987 | 294,571,908.00 |
| 1988 | 25,317,840.00 |

Respondent also determined that the provision for increased interest under section 6621(c) applied. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision in the instant opinion[1] is whether

---

[1] The instant case involves several issues, some of which have been settled. The issues remaining to be decided involve matters that may be classified into four reasonably distinct categories, which the parties have denominated the tax accounting issues, the MACRS depreciation issue, the HealthTrust issue, and the captive insurance or Parthenon Insurance Co. issues. Issues involved in the first three categories were presented at a special trial session, and the captive insurance issues were severed for trial purposes and were presented at a subsequent special trial session. Separate briefs of the parties were filed for each of the distinct categories of issues. In an opinion issued Mar. 7, 1996, we addressed one of the tax accounting issues. Hospital Corp. of America v. Commissioner, T.C. Memo. 1996-105. The instant opinion addresses another of the tax accounting issues

(continued...)

certain petitioners which disposed of some of their hospitals and related medical facilities during taxable year ended 1987 are required to include in income for that year the entire section 481(a) adjustment relating to a change in method of accounting during 1987 that is attributable to those hospitals and related medical facilities.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated herein by reference and are found accordingly.

During the years in issue, petitioners were members of an affiliated group of corporations whose common parent was Hospital Corporation of America (HCA).[2] HCA maintained its principal offices in Nashville, Tennessee, on the date the petitions were filed. For each of the years involved in the instant case, HCA and its domestic subsidiaries filed a consolidated Federal corporate income tax return (consolidated return) on Form 1120 with the Director of the Internal Revenue Service Center at

---

[1] (...continued)
and specifically involves taxable year ended 1987, which year was not involved in the prior Memorandum Opinion. Other issues will be addressed in one or more separate opinions subsequently to be released.

[2] On Feb. 10, 1994, HCA was merged with and into Galen Healthcare, Inc., a subsidiary of Columbia Healthcare Corp. of Louisville, Kentucky, and the subsidiary changed its name to HCA-Hospital Corp. of America. On that same date, the parent changed its name to Columbia/HCA Healthcare Corporation.

Memphis, Tennessee.

Petitioners' primary business is the ownership, operation, and management of hospitals.  A detailed description of petitioners' hospital operations is set forth in Hospital Corp. of America v. Commissioner, T.C. Memo. 1996-105, which will not be reiterated here.  Our findings of fact contained in that Memorandum Opinion are incorporated herein.  For clarity, some of our findings of fact pertinent to the issue involved in the instant opinion are repeated below.

For the years ended 1979 through 1986, petitioners operating hospitals used either a hybrid or an overall accrual method of accounting for reporting income for tax purposes.  Additionally, for those years some petitioners operating nonhospital businesses used the cash method for reporting income for tax purposes.  In Hospital Corp. of America v. Commissioner, supra, we held that petitioners' use of the hybrid method for the hospitals was appropriate for the years ended 1981 through 1986, particularly in view of the hospitals' operations.

For the consolidated return filed for the year ended 1987, pursuant to section 448,[3] petitioners not employing an overall accrual method for computing taxable income for the years ended

---

[3]    Sec. 448, which was added to the Internal Revenue Code by sec. 801 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2345, provides generally that, with certain exceptions not applicable in the instant case, a C corporation, a partnership that has a C corporation as a partner, or a tax shelter may not use the cash method of accounting to compute taxable income.

prior to January 1, 1987, changed their method of accounting to that method. Commencing with taxable year ended 1987 those petitioners took into account positive section 481(a) adjustments[4] necessary to effect the change to an overall accrual method over the periods provided by section 448(d)(7)(C).[5] Thus, on the consolidated return for taxable year ended 1987, those petitioners operating hospitals not theretofore reporting on an

---

[4] Sec. 481(a) provides generally that, if a taxpayer's method of accounting is changed from the method used for the preceding taxable year, adjustments determined necessary solely by reason of the change to prevent amounts from being duplicated or omitted are to be taken into account for the year of change to compute taxable income. A positive sec. 481(a) adjustment increases taxable income, and a negative sec. 481(a) adjustment decreases taxable income. Sec. 481(c) additionally provides generally that the sec. 481(a) adjustment may be taken into account over the period and pursuant to the terms and conditions permitted by regulations. See also sec. 1.481-5, Income Tax Regs., now incorporated in sec. 1.481-4, Income Tax Regs.

[5] Sec. 448(d)(7) provides as follows:

    (7) Coordination with section 481.--In the case of any taxpayer required by this section to change its method of accounting for any taxable year--

        (A) such change shall be treated as initiated by the taxpayer,

        (B) such change shall be treated as made with the consent of the Secretary, and

        (C) the period for taking into account the adjustments under section 481 by reason of such change--

            (i) except as provided in clause (ii), shall not exceed 4 years, and

            (ii) in the case of a hospital, shall be 10 years.

overall accrual method included as additional income one-tenth of the income previously deferred under the hybrid method for years ended prior to 1987. Those petitioners operating nonhospital businesses not theretofore reporting on an overall accrual method included additional income equal to one-fourth of the income previously deferred under the cash method.

Also during 1987, pursuant to a reorganization plan of HCA, effective September 1, 1987, HCA Investments, Inc. (HCAII), a wholly owned subsidiary of HCA, sold all of the stock of certain subsidiaries that owned and operated 104 hospitals, approximately 90 professional office buildings, and related medical facilities, to HealthTrust, Inc.--The Hospital Company (HealthTrust)[6] for a combination of cash, preferred stock, and warrants to acquire shares of HealthTrust common stock. The hospitals were located in 22 States of the United States. Approximately 40 percent of the hospitals were the only hospitals for the communities they served, and approximately 20 percent of the remaining hospitals were one of two hospitals for the communities they served.

In some instances, a subsidiary whose stock was sold to HealthTrust operated one hospital, office building, or medical

---

[6] Prior to Sept. 17, 1987, HealthTrust, under a different name, was an inactive subsidiary of HCA, and HCAII owned all of its stock. On Sept. 17, 1987, HCAII sold the shares of common stock of HealthTrust that it then owned to an employee stock ownership plan adopted by HealthTrust. Other issues relating to the sale of the Category A Corporations and the Category B Corporations to HealthTrust will be addressed in a separate opinion subsequently to be released.

facility, or more than one such enterprise,[7] and HealthTrust wanted to acquire all of the subsidiary's assets. In those instances, prior to the sale to HealthTrust, HCA transferred the subsidiary's stock to HCAII in exchange for stock of HCAII. Hereinafter, we sometimes will refer to those subsidiaries as Category A Corporations.

In other instances, a subsidiary owned and operated more than one hospital, office building, or medical facility, but HealthTrust did not want to acquire all of the subsidiary's assets. In those instances, the subsidiary (New Parent) contributed to a newly formed subsidiary (New Subsidiary) the hospitals, office buildings, or medical facilities (hereinafter collectively referred to as the Facilities) that HealthTrust wanted. The New Parent immediately thereafter transferred the stock of the New Subsidiary to HCAII in exchange for stock of HCAII. HCAII then sold the stock of the New Subsidiaries to HealthTrust. Hereinafter, we sometimes will refer to the New Subsidiaries as Category B Corporations. Each Category B Corporation was a separate enterprise with a separate trade or

---

[7] At the outset of its organization, HCA generally placed all newly constructed or acquired hospitals in separate corporations. In later years, in some cases, HCA placed all newly acquired or newly constructed hospitals located in a particular State in a separate corporation rather than having a separate corporation for each hospital in that State. In a few instances, HCA acquired a group of hospitals that, for various business reasons, were placed in a single corporation or were allowed to remain in the acquired corporation.

business and kept separate books and records. Each New Parent continued to own and operate other hospitals, office buildings, or medical facilities and remained in the hospital business as a subsidiary of HCA.

For purposes of computing gain from the sale of the stock of the Category A Corporations to HealthTrust, petitioners computed HCAII's basis in that stock by taking into account each subsidiary's earnings and profits through the date of sale. At that time, the earnings and profits of each Category A Corporation included only one-tenth of the section 481(a) adjustment with respect to the change in method of accounting. Petitioners anticipated that in HealthTrust's consolidated Federal corporate income tax returns for the succeeding 9 taxable years following 1987 the Category A Corporations would include ratably in income the balance of their section 481(a) adjustments relating to the change in method of accounting.

For purposes of determining gain from the sale of the stock of the Category B Corporations to HealthTrust, petitioners determined HCAII's basis in that stock based upon the values of the assets and liabilities transferred by the New Parents to the Category B Corporations as reflected on financial statement balance sheets. Those assets included the full face amount of the accounts receivable of the Category B Corporations, and hence the assets encompassed some accounts receivable not theretofore included in the income of those Category B Corporations employing

the hybrid method of accounting for taxable years ended prior to 1987.  For taxable years ended after 1987, the New Parents continued to report ratably over the remaining 9 years the balance of the section 481(a) adjustments relating to the change in method of accounting required by section 448(a), including the portion of those section 481(a) adjustments attributable to the Facilities.

In the notice of deficiency, respondent did not adjust HCAII's basis in the stock of the Category A Corporations.  As to the Category B Corporations, however, respondent determined that the New Parents had to include in income for taxable year ended 1987 the entire positive section 481(a) adjustments relating to the change in method of accounting that were attributable to the Facilities.  Accordingly, to effectuate that determination, for purposes of determining the gain from the sale of the stock of the Category B Corporations to HealthTrust, respondent reduced HCAII's basis in each Category B Corporation by the amount of its positive section 481(a) adjustment relating to the change in method of accounting that had not already been included in income.

## OPINION

During 1987, pursuant to a restructuring plan, HCA divested itself of 104 hospitals, approximately 90 professional office buildings, and related medical facilities that were owned and operated by various wholly owned subsidiaries of HCA.  In some

cases, all of the hospitals, office buildings, and related facilities owned by a subsidiary (i.e., a Category A Corporation) were divested. In that case, the stock of the Category A Corporation was transferred to another wholly owned subsidiary of HCA (HCAII) which in turn sold the stock of the Category A Corporation to HealthTrust. The parties agree that under those circumstances, in effect, the section 481(a) adjustment relating to the change in method of accounting required by section 448(a) that was attributable to the Category A Corporation remains with the Category A Corporation and henceforth should be reported ratably over the remaining applicable spread period in the consolidated Federal corporate income tax returns filed by HealthTrust for succeeding tax years.

In other cases, not all of the hospitals, office buildings, and related medical facilities owned and operated by a subsidiary were divested. In those cases, the HCA subsidiary (i.e., the New Parent) formed a New Subsidiary (i.e., a Category B Corporation) to which the New Parent transferred the Facilities that were to be divested. The New Parent, however, continued to own and operate at least one other hospital, professional office building, or related medical facility. The New Parent then transferred the stock of the Category B Corporation to HCAII, which in turn sold that stock to HealthTrust. The parties agree that the portion of the section 481(a) adjustment relating to the change in method of accounting required by section 448(a) that is

attributable to those hospitals, office buildings, and related medical facilities that the New Parent continued to own and operate is to be included in the income of the New Parent ratably over the remaining applicable spread period. The parties do not agree, however, as to the proper tax treatment of the portion of the section 481(a) adjustment that is attributable to the Facilities transferred to the Category B Corporation, the stock of which was then transferred to HCAII and immediately sold to HealthTrust. Respondent contends that the New Parents ceased to engage in the trade or business of the Facilities and, consequently, the New Parents must include in income for 1987 all of the section 481(a) adjustments relating to the change in method of accounting required by section 448(a) that are attributable to the Facilities. Petitioners counter that the New Parents retained the deferred tax liability for the 10-year spread of the section 481(a) adjustment applicable to the Category B Corporations, the New Parents continued to engage in their trade or business of owning and operating hospitals, and therefore they may continue to report ratably in income over the remaining applicable spread period the portion of the section 481(a) adjustments required under section 448(a) that are attributable to the Facilities.

Petitioners contend that the New Parents are not required to include in income for 1987 the entire balance of the positive section 481(a) adjustments relating to the change in method of

accounting required by section 448(a) that are attributable to the Facilities because section 448(d)(7)(C)(ii) clearly and unambiguously gives hospitals a 10-year period in which to spread any section 481(a) adjustment relating to a change in accounting method required by section 448(a). As a result, petitioners argue, resort to the legislative history of section 448 is not appropriate. Petitioners contend further that the legislative history of section 448(d)(7) supports the plain meaning of the statute.

Respondent contends, on the other hand, that, upon disposition of the hospital to which the adjustment relates, the spread period that section 448(d)(7)(C)(ii) provides for hospitals to account for section 481(a) adjustments relating to a change in accounting method required under section 448(a) may be less than 10 years. Respondent maintains that the legislative history of section 448(d)(7) supports the position that the spread period for hospitals is not to remain 10 years under such circumstances.

In construing section 448(d)(7) our task is to give effect to the intent of Congress. We begin with the statutory language, which is the most persuasive evidence of the statutory purpose. United States v. American Trucking Associations, Inc., 310 U.S. 534, 542-543 (1940); Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 93-94 (1934); General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216, 240 (1994), supplemented by 104 T.C.

248 (1995).  Ordinarily, the plain meaning of statutory language is conclusive.  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-242 (1989).

Where a statute is silent or ambiguous, however, we look to legislative history in an effort to ascertain congressional intent.  Burlington No. R.R. v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); United States v. American Trucking Associations, Inc., supra at 543-544; Peterson Marital Trust v. Commissioner, 102 T.C. 790, 799 (1994), affd. 78 F.3d 795 (2d Cir. 1996); U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989).  Even where the statutory language appears to be clear, we are not precluded from consulting legislative history.  United States v. American Trucking Associations, Inc., supra at 543-544.  Nevertheless, our authority to construe a statute is limited where the agency charged with administering that statute has promulgated regulations thereunder.

The limitation on our authority is found in the so-called Chevron rule as stated in the following passage:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary

in the absence of an administrative interpretation.
Rather, if the statute is silent or ambiguous with
respect to the specific issue, the question for the
court is whether the agency's answer is based on a
permissible construction of the statute. [Chevron
U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467
U.S. 837, 842-843 (1984); fn. refs. omitted.]

See also NationsBank v. Variable Annuity Life Ins. Co., 513 U.S.

___, 115 S. Ct. 810, 813 (1995); Pension Benefit Guar. Corp. v.

LTV Corp., 496 U.S. 633, 647-648 (1990). The Supreme Court

further has stated that a reviewing court

need not conclude that the agency construction was the only
one it permissibly could have adopted to uphold the
construction, or even the reading the court would have
reached if the question initially had arisen in a judicial
proceeding. * * * [Chevron U.S.A., Inc. v. Natural Res.
Def. Council, Inc., supra at 843 n.11.]

Accordingly, "If the administrator's reading fills a gap or

defines a term in a way that is reasonable in light of the

legislature's revealed design, we give the administrator's

judgment 'controlling weight.'" NationsBank v. Variable Annuity

Life Ins Co., 513 U.S. at ___, 115 S. Ct. at 813-814. Despite

the fact that the Chevron rule "has had a checkered career in the

tax arena", Central Pa. Sav. Association v. Commissioner, 104

T.C. 387, 391-392 (1995), the Court of Appeals for the Sixth

Circuit, to which an appeal of the instant case would lie absent

stipulation of the parties to the contrary, has stated that where

"Congress has not directly spoken to the precise question at

issue, the [Chevron] rule * * * should be applied". Peoples Fed.

Sav. & Loan Association v. Commissioner, 948 F.2d 289, 299 (6th

Cir. 1991), revg. T.C. Memo. 1990-129. "If there are gaps left by silence or ambiguity of the statutes in question, agencies may fill the gaps with necessary rules, providing they are reasonable, and courts should not interfere with this process." Id. at 300.

Petitioners contend that the unambiguous language of section 448(d)(7)(C)(ii) allowing hospitals to spread over a 10-year period a section 481(a) adjustment relating to a change in method of accounting required under section 448(a) may not be limited under any circumstances. Respondent contends, on the other hand, that a hospital business is entitled to the benefits of a 10-year spread only for as long as the hospital engages in the specific trade or business which generated the section 481(a) adjustment being spread over those 10 years.

As we stated above, in accordance with the Chevron rule, our first task in construing section 448(d)(7)(C) is to determine whether Congress addressed the precise question in issue. As we view the matter, the specific question we must resolve in the instant opinion is whether a taxpayer may continue to spread ratably over a 10-year period a section 481(a) adjustment attributable to a hospital that relates to a change in method of accounting made to conform the hospital's method of accounting to the requirements of section 448(a) even after the taxpayer ceases to operate that hospital. The question is one of first impression.

Section 448(d)(7)(C)(i) generally provides that a taxpayer required by section 448(a) to change from the cash method of accounting may spread the section 481(a) adjustment attributable to that change over a period that "shall not exceed 4 years". Section 448(d)(7)(C)(ii), however, provides that, for "a hospital", the spread period "shall be 10 years."  See supra note 5.

Respondent argues that the phrase "shall not exceed", which modifies the 4-year spread period provided in clause (i) of section 448(d)(7)(C), applies also to the 10-year spread period specified for hospitals in clause (ii) of that section. Respondent relies on the following excerpt from H. Rept. 99-426, at 608-609 (1985), 1986-3 C.B. (Vol. 2) 1, 608-609, to support the position that Congress did not intend to give hospitals, under all circumstances, an unlimited 10-year period for the section 481(a) adjustment:

Transitional rules

The committee bill treats any change from the cash method of accounting required as a result of the committee bill as a change in the taxpayer's method of accounting, initiated by the taxpayer with the consent of the Secretary of the Treasury.  In order to prevent items of income and expense from being included in taxable income either twice or not at all, an adjustment under section 481 is required to be made.  The amount of such adjustment will be included in income over a period not to exceed five taxable years. It is expected that the concepts of Revenue Procedure 84-74, 1984-2 C.B. 736, generally will apply to determine the actual timing of recognition of income or expense as a result of the adjustment.[4]

In the case of the business of operating a hospital,

the transitional rules will apply with the section 481 adjustment amount to be included in income over a period <u>not to exceed</u> ten taxable years, rather than five. * * * [Emphasis supplied.]

_____

[4]Under that revenue procedure, the adjustment from a change in accounting generally is included in income over a period equal to the less [sic] of the number of years the taxpayer has used the accounting method or a specified number of years.

Petitioners assert that the quoted excerpt is based on language that was not enacted.[8] Under the bill as originally proposed, the spread for hospitals was a period that "shall not exceed" 10 years. The law as enacted, however, provides for a spread period that "shall be" 10 years. Petitioners argue that the fact that the provision was changed demonstrates that the difference in treatment for hospital and nonhospital businesses was intentional.

Petitioners maintain further that the legislative history relating to section 448(d)(7)(C) confirms that Congress intended to make a distinction between hospitals, which were given a fixed 10-year period to spread section 481(a) adjustments required as a

_____

[8]    As originally reported by the House Committee on Ways and Means on Dec. 7, 1985, the provision in the bill that subsequently became sec. 448(d)(7)(C) provided as follows:

the period for taking into account the adjustment under section 481 by reason of such change [from the cash method to an accrual method of accounting] shall not exceed 5 years (10 years in the case of a hospital described in section 144(b)(3)).  [H.R. 3838, 99th Cong., 1st Sess. sec. 902 (1985).]

result of the enactment of section 448(a), and other businesses, which were given a 4-year period that could be shortened under appropriate circumstances. In support of their position, petitioners rely on H. Conf. Rept. 99-841 (Vol. 2), at II-288 to II-289 (1986), 1986-3 C.B. (Vol. 4) 1, 288-289, which states in pertinent part as follows:

> Any adjustment required by section 481 as a result of such change [from the cash method to an accrual method] generally shall be taken into account over a period not to exceed four years. * * * In the case of a hospital, the adjustment shall be taken into account ratably over a ten-year period. * * *
>
> The conferees intend that the timing of the section 481 adjustment other than for a hospital will be determined under the provisions of Revenue Procedure 84-74, 1984-2 C.B. 736. * * *

We agree with petitioners that Congress intended to provide a different section 481(a) adjustment period for hospitals from the period provided for nonhospital businesses. We do not agree, however, that the wording of the statute requires the conclusion that under no circumstances may the 10-year spread period for hospitals be shortened.

In our view, petitioners have focused their analysis too narrowly in construing section 448(d)(7)(C). We agree that the phrase "shall be 10 years" by itself appears clear on its face. The language of a statute, however, cannot be viewed in isolation. See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 40, supplemented by 104 T.C. 417 (1995). In construing the meaning of section 448(d)(7)(C), it is necessary to consider all

of the words of the statute as well as their context, the purposes of the law, and the circumstances under which the words were employed. See Deal v. United States, 508 U.S. 129, 132 (1993); Shell Oil Co. v. Iowa Dept. of Revenue, 488 U.S. 19 (1988); Sundstrand Corp. v. Commissioner, 17 F.3d 965, 967 (7th Cir. 1994), affg. 98 T.C. 518 (1992). Furthermore, we must view the statute in context as a whole and with a view to its place in the overall statutory scheme. King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991); Stanford v. Commissioner, 297 F.2d 298, 308 (9th Cir. 1961), affg. 34 T.C. 1150 (1960); Norfolk S. Corp. v. Commissioner, supra at 41.

Section 448(d)(7)(C)(ii) provides that, for purposes of determining the period for taking into account a section 481(a) adjustment relating to a change in method of accounting required under section 448(a), the spread period "in the case of a hospital, shall be 10 years." Petitioners' analysis of the statutory language focuses primarily on the phrase "shall be 10 years." Their analysis basically ignores the other words in the statute and the purposes of the statutory provision as a whole.

On brief, neither party addresses the significance of Congress' choice of the term "a hospital" in section 448(d)(7)(C)(ii) to the precise question involved in the instant opinion. Indeed, petitioners generally paraphrase section 448(d)(7)(C)(ii) to read: "the period for taking into account the adjustment under section 481 for hospitals shall be 10

years."  (Emphasis added.)  We believe, however, that Congress'
choice of the words "in the case of a hospital" rather than the
phrase "in the case of hospitals" renders section
448(d)(7)(C)(ii) ambiguous inasmuch as it is silent as to the
question of whether, where a taxpayer is engaged in the business
of operating hospitals, the tax benefit of spreading over 10
years a section 481(a) adjustment required to conform a
hospital's method of accounting to section 448(a) belongs to the
hospital to which the adjustment is attributable or to the
taxpayer that owns that hospital.  Neither the statute nor the
legislative history addresses that precise question.

Additionally, the language of section 448(d)(7)(C) gives no
indication that Congress gave any consideration to the treatment
of the section 481(a) adjustment where a hospital ceases to
engage in the trade or business giving rise to that section
481(a) adjustment or where the hospital terminates existence
prior to the end of the spread period.  Nor is there any evidence
in the legislative history of section 448 that Congress ever had
a specific or particular intent with respect to that question.

The statute, thus, has left gaps creating ambiguity as to
its precise meaning.[9]  Regulations issued under section

_____

[9]     Moreover, by treating the change in method of accounting
required under sec. 448(a) as a change initiated by the taxpayer,
see sec. 448(d)(7)(A), it could be argued that the statute
indicates a congressional intent to permit the Commissioner to
impose reasonable terms and conditions on the making of that
                                                  (continued...)

448(d)(7)(C) attempt to fill the gaps by requiring both hospital and nonhospital businesses that either cease to engage in the trade or business to which a section 481(a) adjustment relates or terminate existence prior to the end of the spread period to take into account in the year of cessation or termination any remaining portion of the section 481(a) adjustment.  Under such circumstances, the Chevron rule prevents us from substituting our own construction of section 448 if the Commissioner's interpretation is reasonable.  Peoples Fed. Sav. & Loan Association v. Commissioner, 948 F.2d at 300.

Are the Regulations Valid?

Final regulations interpreting section 448(d)(7)(C) are provided in section 1.448-1(g), Income Tax Regs.[10]  The final

---

9   (...continued)
change pursuant to the provisions of secs. 1.446-1(e)(3) and 1.481-5, Income Tax Regs., that would prevent a taxpayer from escaping forever taxation upon income previously deferred under the hybrid method.

10    Sec. 1.448-1(g), Income Tax Regs., provides in pertinent part as follows:

> (g) Treatment of accounting method change and timing rules for section 481(a) adjustment--(1) Treatment of change in accounting method.   * * *

> (2) Timing rules for section 481(a) adjustment--(i) In general.  Except as otherwise provided in paragraphs (g)(2)(ii) and (g)(3) of this section, a taxpayer required by this section to change from the cash method must take the section 481(a) adjustment into account ratably (beginning with the year of change) over the shorter of--

> (A) The number of taxable years the
> (continued...)

---

(...continued)
taxpayer used the cash method, or

      (B) 4 taxable years, provided the
taxpayer complies with the provisions of
paragraph (h)(2) or (h)(3) of this section
for its first section 448 year.

     (ii) <u>Hospital timing rules</u>--(A) <u>In general.</u>  In the
case of a hospital that is required by this section to
change from the cash method, the section 481(a) adjustment
shall be taken into account ratably (beginning with the year
of change) over 10 years, provided the taxpayer complies
with the provisions of paragraph (h)(2) or (h)(3) of this
section for its first section 448 year.

    *      *      *      *      *      *      *

     (iii) <u>Untimely change in method of accounting to comply
with this section.</u>  Unless a taxpayer (including a hospital
and a cooperative) required by this section to change from
the cash method complies with the provisions of paragraph
(h)(2) or (h)(3) of this section for its first section 448
year within the time prescribed by those paragraphs, the
taxpayer must take the section 481(a) adjustment into
account under the provisions of any applicable
administrative procedure that is prescribed by the
Commissioner after January 7, 1991, specifically for
purposes of complying with this section.  Absent such an
administrative procedure, a taxpayer must request a change
under §1.446-1(e)(3) and shall be subject to any terms and
conditions (including the year of change) as may be imposed
by the Commissioner.

     (3) <u>Special timing rules for section 481(a) adjustment</u>--
(i) <u>One-third rule.</u>  If, during the period the section 481(a)
adjustment is to be taken into account, the balance of the
taxpayer's accounts receivable as of the last day of each of
two consecutive taxable years is less than 66 2/3 percent of
the taxpayer's accounts receivable balance at the beginning
of the first year of the section 481(a) adjustment, the
balance of the section 481(a) adjustment (relating to
accounts receivable) not previously taken into account shall
be included in income in the second taxable year.  This
paragraph (g)(3)(i) shall not apply to any hospital * * *

(continued...)

regulations, effective generally for taxable years beginning
after December 31, 1986, were promulgated in 1993 pursuant to the
Commissioner's authority found in section 7805(a) to "prescribe
all needful rules and regulations for the enforcement of this
title".  T.D. 8514, 1994-1 C.B. 141; sec. 1.448-1(i)(1), Income
Tax Regs.[11]  The final regulations interpreting section

---

[10]  (...continued)

    *       *       *       *       *       *       *

      (iii) <u>Cessation of trade or business.</u>  If the taxpayer
ceases to engage in the trade or business to which the
section 481(a) adjustment relates, or if the taxpayer
operating the trade or business terminates existence, and
such cessation or termination occurs prior to the expiration
of the adjustment period described in paragraph (g)(2)(i) or
(ii) of this section, the taxpayer must take into account, in
the taxable year of such cessation or termination, the
balance of the adjustment not previously taken into account
in computing taxable income.  For purposes of this paragraph
(g)(3)(iii), the determination as to whether a taxpayer has
ceased to engage in the trade or business to which the
section 481(a) adjustment relates, or has terminated its
existence, is to be made under the principles of §1.446-
1(e)(3)(ii) and its underlying administrative procedures.

[11]  Sec. 1.448-1(i), Income Tax Regs., provides in pertinent
part as follows:

      <u>(i) Effective date.</u>  (1) <u>In general.</u>  Except as
provided in paragraph (i)(2), (3), and (4) of this section,
this section applies to any taxable year beginning after
December 31, 1986.

    *       *       *       *       *       *       *

      <u>(4) Transitional rule for paragraphs (g) and (h)
of this section.</u>  To the extent the provisions of
paragraphs (g) and (h) of this section were not
reflected in paragraphs (g) and (h) of §1.448-1T (as

                                              (continued...)

448(d)(7)(C) adopted, with certain modifications, applicable provisions under temporary regulations, as amended, originally promulgated in 1987.  T.D. 8514, supra; see T.D. 8143, 1987-2 C.B. 121.[12]  Since Congress did not expressly delegate authority to the Commissioner to fill the gaps left by Congress, the Commissioner's authority is implicit rather than explicit.  For the reasons discussed below, we find reasonable the provision of section 1.448-1(g)(3)(iii), Income Tax Regs., regarding the acceleration of the balance of the adjustment not previously taken into account upon a cessation of the respective businesses to which the section 481 adjustment relates (hereinafter the cessation-of-business acceleration provision).

Section 448(d)(7)(C) specifically coordinates section 448 with section 481(a).  Section 448 effectuates Congress' intent to require most large corporations to use an overall accrual method of accounting.  See H. Rept. 99-426, at 604-607 (1985), 1986-3 C.B. (Vol. 2) 1, 604-607.  Section 448(d)(7)(C) generally is effective for taxable years beginning after December 31, 1986.

_____

[11]  (...continued)
      set forth in 26 CFR Part 1 as revised on April 1,
      1993), paragraphs (g) and (h) of this section will not
      be adversely applied to a taxpayer with respect to
      transactions entered into before December 27, 1993.


[12]  The temporary income tax regulations relating to sec. 448 as originally promulgated in T.D. 8143, 1987-2 C.B. 121, were amended by T.D. 8194, 1988-1 C.B. 186; T.D. 8329, 1991-1 C.B. 62; and T.D. 8514, 1994-1 C.B. 141.

Tax Reform Act of 1986, Pub. L. 99-514, sec. 801(d), 100 Stat. 2348.  Section 448(d)(7) provides coordination with section 481 for those taxpayers that are required by section 448(a) to change from the cash method of accounting.

Section 481 was enacted during 1954.  It was designed to prevent items of income or expense from being omitted or duplicated as a result of a change in method of accounting initiated by either the taxpayer or the Government.  S. Rept. 1622, 83d Cong., 2d Sess. 307-311 (1954).  Prior to the enactment of section 481, consistent with rules laid down by the decided cases, adjustments needed to prevent such omission or duplication could be made only if the change in method of accounting was initiated by the taxpayer.  Dearborn Gage Co. v. Commissioner, 48 T.C. 190, 200 (1967); S. Rept. 1622, supra at 307-311.  The provision does not apply, however, to adjustments attributable to years before 1954 unless the change in method of accounting is initiated by the taxpayer.  Sec. 481(a)(2).  Section 481(c) provides that a spread of the section 481(a) adjustment over more than 1 year is allowed only as permitted under regulations. Regulations interpreting section 481(c) provide that a section 481(a) adjustment may be taken into account under terms and conditions agreed to by the Commissioner and the taxpayer.  Sec. 1.481-5, Income Tax Regs.

Absent a provision similar to the cessation-of-business acceleration provision, any portion of a section 481(a)

adjustment being reported ratably over a number of years that had not yet been accounted for at the time a taxpayer ceased to engage in the trade or business to which the adjustment relates might be omitted from the income of the trade or business which gave rise to that section 481(a) adjustment. Thus, in the absence of a cessation-of-business acceleration provision, a taxpayer could contravene the general intent of section 481(a), which is to prevent the omission or duplication of an item of income or expense as a result of a change in method of accounting, by merely restructuring its business. Under such circumstances, the taxpayer would distort its overall lifetime income.

The rationale for the difference in the spread period for the section 481(a) adjustment granted hospital and nonhospital businesses is not explained in either the language of section 448 or its legislative history. It is clear, however, that Congress, for whatever reason, gave hospitals a longer spread period than nonhospital businesses in reporting a section 481(a) adjustment relating to the change in method of accounting required by section 448(a). Nevertheless, there is nothing in the statute or its legislative history to indicate that Congress intended to give hospital businesses an advantage in determining the total amount of the section 481(a) adjustment that would be required to be included in income. In other words, in giving hospitals a longer period within which to account for the section 481(a)

adjustment, Congress expressed no specific intent to give hospitals a mechanism to contravene the provisions of section 481(a) and thereby omit items of income which they previously had deferred under the cash method.

The cessation-of-business acceleration provision is in harmony with the purposes of both sections 448 and 481 and is not inconsistent with the statutory scheme as a whole. Moreover, the cessation-of-business acceleration provision accelerates the 10-year period given hospitals to spread the section 481(a) adjustment only under explicit and limited circumstances that prevent the omission or duplication of income. We believe the regulation implements the purpose of the statute in a reasonable manner and, thus, must be upheld as a permissible construction of the statute. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-843; United States v. Correll, 389 U.S. 299, 307 (1967).

Does the Cessation-of-Business Acceleration Provision Apply in the Instant Case?

Additionally, petitioners contend that acceleration of the section 481(a) adjustment is not required in the instant case because the hospitals that transferred assets to the Category B Corporations did not cease to engage in the hospital business after the sale of those assets to HealthTrust. Respondent counters that a taxpayer ceases business when there is an elimination of the taxpayer's business completely or when there

is a sale or termination of one of several businesses being conducted by the taxpayer. In respondent's view, the New Parents ceased to conduct the business of those hospitals transferred to the Category B Corporations and then sold to HealthTrust; therefore, the New Parents are not entitled to spread over 10 years any portion of the section 481(a) adjustments attributable to those hospitals. Thus, respondent maintains, the New Parents must recognize for 1987 all of the section 481(a) adjustments relating to the change in method of accounting attributable to the Category B Corporations.

Petitioners counter that in the instant case the section 481(a) adjustments relate to the trade or business of operating hospitals, and that no petitioner ceased to engage in that trade or business. Petitioners argue that respondent's position interprets the provisions of section 1.448-1(g)(3)(iii), Income Tax Regs.,[13] as if the principles of Rev. Proc. 84-74, 1984-2

---

[13]    In their opening brief, petitioners refer to sec. 1.448-1(g)(3)(iii), Income Tax Regs., as temporary regulations. Prior to modification by the final regulations, the applicable cessation of business provision reads as follows:

> (iii) Cessation of trade or business. If a taxpayer ceases to engage in the trade or business to which the section 481(a) adjustment relates prior to the expiration of the adjustment period described in paragraph (g)(2)(i) or (ii) of this section, the taxpayer must take into account, in the year of such cessation, the balance of the adjustment not previously taken into account in computing taxable income. If the taxpayer is acquired in a transaction to which section 381 applies, and the acquiring corporation continues to engage in the trade or business to which the

(continued...)

C.B. 736, apply to hospitals as well as to other types of

business. That interpretation, petitioners contend, is

inconsistent with the statutory language and its legislative

history and is not required by the literal language of the

regulations. We find petitioners' reading of the regulation too

broad.

Petitioners appear to base their position in part on the

following language contained in H. Conf. Rept. 99-841 (Vol. 2),

at II-288 (1988), 1986-3 C.B. (Vol. 4) 1, 288: "The conferees

intend that the timing of the section 481 adjustment other than

for a hospital will be determined under the provisions of Rev.

Proc. 84-74, 1984-2 C.B. 736." Rev. Proc. 84-74, 1984-2 C.B.

---

[13] (...continued)
section 481(a) adjustment relates, the acquiring taxpayer
shall continue to take into account the section 481(a)
adjustment as if it were the distributor or transferor
taxpayer. [Sec. 1.448-1T(g)(3)(iii), Temporary Income Tax
Regs., 52 Fed. Reg. 22772-22773 (June 16, 1987).]

In their brief, however, petitioners quote the final regulations
in discussing the cessation-of-business acceleration provision.
Based on the quoted language and the substance of their
arguments, it is clear to the Court that petitioners utilized the
final regulations in formulating their arguments relating to the
cessation-of-business acceleration provision. We agree that the
final regulations are applicable in the instant case and,
therefore, we restrict our discussion to those regulations.
Nonetheless, for purposes of the specific issue before the Court,
our conclusion that petitioners must include in income for 1987
all of the sec. 481(a) adjustments relating to the Category B
Corporations would be the same had we relied on the cessation-of-
business provision as it was defined in the temporary
regulations.

736,[14] as did its predecessor and as does it successor, prescribed general administrative procedures under section 1.446-1(e), Income Tax Regs., for taxpayers to obtain the consent of the Commissioner for changes in methods of accounting for Federal income tax purposes.  The revenue procedure provided, among other things, rules for determining the appropriate period for taking into account the section 481(a) adjustments relating to changes in methods of accounting and under specified circumstances required acceleration of the reporting of the section 481(a) adjustment, including in the event that a taxpayer ceased to engage in the trade or business to which the section 481(a) adjustment related, on which occasion the taxpayer had to include any unreported section 481(a) adjustment in income for the year when trade or business ceased.  See Rev. Proc. 84-74, secs. 5.06-5.09, 1984-2 C.B. at 742-744.

We do not read the cryptic passage in the conference report as a clear expression of congressional intent to restrict the Commissioner's authority to compel acceleration of the 10-year spread of a section 481(a) adjustment relating to a change in method of accounting required under section 448(a) should a

---

[14]    Rev. Proc. 84-74, 1984-2 C.B. 736, which clarified, modified, and superseded Rev. Proc. 80-51, 1980-2 C.B. 818, effective for Forms 3115, Application for Change in Accounting Method, filed for taxable years beginning on or after Oct. 29, 1984, Rev. Proc. 84-74, secs. 1, 11, 1984-2 C.B. at 737, 751, was modified and superseded by Rev. Proc. 92-20, 1992-1 C.B. 685, effective for Forms 3115 filed on or after Mar. 23, 1992, Rev. Proc. 92-20, secs. 1, 14, 1992-1 C.B. at 688, 706.

taxpayer cease to engage in the trade or business to which that adjustment relates. As we discussed above, we find the cessation-of-business acceleration provision a permissible construction of the statute inasmuch as it fulfills the congressional objective of coordinating section 448(a) and section 481(a) in a reasonable manner. In our view, the presence of a similar provision in Rev. Proc. 84-74 is not sufficient to defeat its inclusion in the regulations.

The rules and requirements of Rev. Proc. 84-74 were detailed and complex. The language of section 448(d)(7)(C) and of its legislative history gives no indication that Congress even focused on the cessation-of-business acceleration provision contained in that revenue procedure. Moreover, the requirement that the balance of a section 481(a) adjustment must be taken into income when a taxpayer ceases to engage in the trade or business to which the section 481(a) adjustment relates is not a condition unique to Rev. Proc. 84-74. Indeed, commencing at least from the early 1970's, a cessation-of-business acceleration provision appears to have been included customarily as a condition to consent to a spread of a section 481(a) adjustment whenever the Commissioner issued a change in accounting method ruling. See, e.g., Rev. Rul. 85-134, 1985-2 C.B. 160; Rev. Rul. 80-39, 1980-1 C.B. 112; Rev. Rul. 77-264, 1977-2 C.B. 187; Rev. Rul. 70-318, 1970-1 C.B. 113; see also Rev. Proc. 85-8, 1985-1 C.B. 495 (procedure for accrual basis taxpayers to change method

of accounting for bad debts from the specific charge-off method
to the reserve method); Rev. Proc. 84-27, 1984-1 C.B. 469
(mandatory procedure for taxpayers to change their method of
accounting for interest on indebtedness when they had been
reporting interest income or deductions in accordance with the
Rule of 78 computation); Rev. Proc. 83-54, 1983-2 C.B. 569
(procedure for taxpayers to expeditiously obtain consent to
change their method of accounting for gambling receivables); Rev.
Proc. 78-22, 1978-2 C.B. 499 (procedure for farmers, nurserymen,
and florists to change from accrual method to cash method of
accounting); Rev. Proc. 70-16, 1970-1 C.B. 441, amplifying Rev.
Proc. 67-10, 1967-1 C.B. 585 (procedure for taxpayers to
expeditiously obtain consent to change from the cash method to
the accrual method of accounting) to add specifically the
condition that any remaining balance of a section 481(a)
adjustment must be included in income for the year that the
taxpayer ceased to engage in the trade or business to which the
adjustment related; Rev. Proc. 70-15, 1970-1 C.B. 441, amplifying
Rev. Proc. 64-51, 1964-2 C.B. 1003 (procedure for taxpayers to
expeditiously obtain consent to change their method of accounting
for bad debts from the specific charge-off method to the reserve
method) to add specifically the cessation-of-business
acceleration provision; see also Shore v. Commissioner, 69 T.C.
689, 691-692 (1978), affd. 631 F.2d 624 (9th Cir. 1980)
(Commissioner is given authority under sections 446(e) and 481(c)

to prescribe the cessation-of-business acceleration provision as a condition to obtaining consent to a change in method of accounting and a spread of the resulting section 481(a) adjustment).  Accordingly, we conclude that the presence of a cessation-of-business acceleration provision in Rev. Proc. 84-74 does not render section 1.448-1(g)(3)(iii), Income Tax Regs., inconsistent with section 448(d)(7)(C).

Additionally, we conclude that requiring the Category B Corporations to include the entire balance of the section 481(a) adjustment in income for 1987 is within the scope of section 1.448-1(g)(3)(iii), Income Tax Regs.  The cessation-of-business acceleration provision contained in the regulations is applicable whenever a "taxpayer has ceased to engage in the trade or business to which the section 481(a) adjustment relates" prior to the end of the adjustment period.  The determination as to whether a taxpayer has ceased to engage in the trade or business to which the section 481(a) adjustment relates, or has terminated its existence, is made under the principles of section 1.446-1(e)(3)(ii), Income Tax Regs., and its underlying administrative procedures.  Sec. 1.448-1(g)(3)(iii), Income Tax Regs.

Respondent has taken the position that where a corporation maintains different divisions for each trade or business and one of the divisions ceases to engage in its trade or business, the corporation ceases to engage in that trade or business and, therefore, must include in income any remaining portion of a

section 481(a) adjustment relating to the division's trade or business.  Rev. Proc. 87-55, sec. 4.05(1), 1987-2 C.B. 671, 673; see also Rev. Rul. 80-39, 1980-1 C.B. 112 (a corporation seeking permission to change its method of accounting for one of its divisions must agree to include the balance of the related section 481(a) adjustment in income for the year in which the division ceases to engage in that trade or business).  In the instant case, petitioners stipulated that each Category B Corporation was a separate enterprise with a separate trade or business and kept separate books and records.  The assets of those Category B Corporations consisted of those Facilities owned and operated by the New Parents that HealthTrust wanted to acquire.  The Facilities were separate trades or businesses of the New Parents.  Indeed, 40 percent of the hospitals were the only hospitals for the communities they served, and 20 percent of the remaining hospitals were one of two hospitals for the communities they served.  The New Parents ceased to engage in those trades or businesses when the Facilities were transferred to the Category B Corporations and sold to HealthTrust. Consequently, although the New Parents continued to own and operate other hospitals, office buildings, or medical facilities, they did not continue the business of those Facilities which had been spun off to the Category B Corporations.  Requiring the New Parents to include in income the portion of the section 481(a) adjustment attributable to the Category B Corporation for the

year they were sold to HealthTrust is reasonable because the New Parents ceased operating the businesses that gave rise to that portion of the section 481(a) adjustment.  Moreover, permitting the New Parents to continue to account for a section 481(a) adjustment attributable to businesses they no longer operate would distort the income of the New Parents over the remaining adjustment period.

Based on the foregoing, we conclude that petitioners must include in income for 1987 all of the section 481(a) adjustment relating to the change in method of accounting attributable to the Category B Corporations.

To reflect the foregoing,

<u>Appropriate orders</u>

<u>will be issued.</u>