107 T.C. No. 8

UNITED STATES TAX COURT

HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10663-91, 13074-91     Filed September 17, 1996.
28588-91,  6351-92.

Ps own, operate, and manage hospitals and related businesses.  For taxable year ended 1987 and following years, certain Ps elected to use the nonaccrual-experience method provided pursuant to sec. 448(d)(5), I.R.C.  On audit, R determined that those Ps could not use the nonaccrual-experience method to compute taxable income for either 1987 or 1988 because Ps sold medical supplies and because they could not determine the portion of their income attributable solely to the performance of services, or, alternatively, that if Ps are entitled to use the nonaccrual-experience method, they must use the formula set forth in amended sec. 1.448-2T(e), Temporary Income Tax Regs., 53 Fed. Reg. 12513 (Apr. 15, 1988), as applied to the portion of the hospitals' income that R determined is attributable to the performance of services.  Ps claim that all of the hospitals' income is attributable to the performance of services and, therefore, they may use the nonaccrual-experience method for all of their income, the amended temporary regulations are invalid, and Ps may use the formula originally set forth in sec. 1.448-2T(e),

Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June 16, 1987).

Held: Amended sec. 1.448-2T(e), Temporary Income Tax Regs., 53 Fed. Reg. 12513 (Apr. 15, 1988), is a permissible construction of sec. 448(d)(5), I.R.C., and, therefore, the amount to be excluded from income for 1987 and 1988 pursuant to sec. 448(d)(5), I.R.C., must be calculated as required by the amended temporary regulations.

Held, further: Medical supplies are a necessary and vital part of furnishing medical services to Ps' patients and, therefore, income attributable to medical supplies constitutes income earned from the performance of services for purposes of sec. 448(d)(5), I.R.C.

N. Jerold Cohen, Randolph W. Thrower, J.D. Fleming, Jr., Walter H. Wingfield, Stephen F. Gertzman, Reginald J. Clark, Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley, and John W. Bonds, Jr., for petitioners in docket No. 10663-91.

N. Jerold Cohen, Randolph W. Thrower, J.D. Fleming, Jr., Walter H. Wingfield, Stephen F. Gertzman, Reginald J. Clark, Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley, John W. Bonds, Jr., and Daniel R. McKeithen, for petitioners in docket No. 13074-91.

N. Jerold Cohen, Walter H. Wingfield, Stephen F. Gertzman, Amanda B. Scott, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 28588-91.

N. Jerold Cohen, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 6351-92.

Robert J. Shilliday, Jr., Vallie C. Brooks, and William B. McCarthy, for respondent.


WELLS, Judge:  These cases were consolidated for purposes of trial, briefing, and opinion and will hereinafter be referred to as the instant case.[1]  Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax as shown below.

| TYE | Deficiency |
| --- | --- |
| 1978 | $2,187,079.00 |
| 1980 | 388,006.58 |
| 1981 | 94,605,958.92 |
| 1982 | 29,691,505.11 |
| 1983 | 43,738,703.50 |
| 1984 | 53,831,713.90 |
| 1985 | 85,613,533.00 |
| 1986 | 69,331,412.00 |

---

[1]    The instant case involves several issues, some of which have been settled.  The issues remaining to be decided involve matters that may be classified into four reasonably distinct categories, which the parties have denominated the tax accounting issues, the MACRS depreciation issue, the HealthTrust issue, and the captive insurance or Parthenon Insurance Co. issues.  Issues involved in the first three categories were presented at a special trial session, and the captive insurance issues were severed for trial purposes and were presented at a subsequent special trial session.  Separate briefs of the parties were filed for each of the distinct categories of issues.  In a Memorandum Opinion issued Mar. 7, 1996, Hospital Corp. of America v. Commissioner, T.C. Memo. 1996-105, and an Opinion issued Sept. 12, 1996, Hospital Corp. of America v. Commissioner, 107 T.C. ___ (1996), we addressed two of the tax accounting issues.  The instant opinion addresses the last of the tax accounting issues and specifically involves taxable years ended 1987 and 1988, which were not involved in T.C. Memo. 1996-105 (but 1987 was involved in Hospital Corp. of America v. Commissioner, 107 T.C. __ (1996)).  Other issues will be addressed in one or more separate opinions subsequently to be released.

|      |                |
|------|----------------|
| 1987 | 294,571,908.00 |
| 1988 | 25,317,840.00  |

Respondent also determined that the provision for increased interest pursuant to section 6621(c) applied.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue to be decided in the instant opinion is what amount, if any, petitioners may exclude from income for taxable years ended 1987 and 1988 pursuant to the nonaccrual-experience method.

### FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91.  We incorporate those stipulated facts herein by reference and find them as facts herein.

During the years in issue, petitioners were members of an affiliated group of corporations whose common parent was Hospital Corporation of America (HCA).[2]  HCA maintained its principal offices in Nashville, Tennessee, on the date the petitions were filed.  For each of the years involved in the instant case, HCA and its domestic subsidiaries filed a consolidated Federal corporate income tax return (consolidated return) on Form 1120

[2]    On Feb. 10, 1994, HCA was merged with and into Galen Healthcare, Inc., a subsidiary of Columbia Healthcare Corp. of Louisville, Kentucky, and the subsidiary changed its name to HCA-Hospital Corp. of America.  On that same date, the parent changed its name to Columbia/HCA Healthcare Corp.

with the Director of the Internal Revenue Service Center at Memphis, Tennessee.

Petitioners' primary business is the ownership, operation, and management of hospitals. A detailed description of petitioners' hospital operations is set forth in Hospital Corp. of America v. Commissioner, T.C. Memo. 1996-105, most of which will not be reiterated here. Our findings of fact contained in that Memorandum Opinion are incorporated herein.

For taxable years ended before January 1, 1987, some petitioner hospitals used the Black Motor formula[3] to determine the portion of their yearend accounts receivable that was unlikely to be collected. Those hospitals established reserves for bad debts (bad debt reserves) and, based on the Black Motor determinations, for years ended prior to 1987 they deducted additions to the bad debt reserves as ordinary business expenses in accordance with section 166(c).[4] In audits of petitioners'

---

[3]   The Black Motor formula is based on a method for computing additions to a reserve for bad debts that was described initially in Black Motor Co. v. Commissioner, 41 B.T.A. 300 (1940), affd. on another issue 125 F.2d 977 (6th Cir. 1942).

[4]   Sec. 166(c), which was repealed by sec. 805(a) of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2361, provided that an accrual method taxpayer generally could deduct a reasonable addition to a reserve for bad debts in lieu of the specific charge-off of wholly or partially worthless debts provided by sec. 166(a). Congress repealed sec. 166(c) because it believed that allowing deductions for losses that statistically occur in the future was inconsistent with the treatment of other deductions under the all events test inasmuch as allowance of the deduction before the losses occurred

(continued...)

Federal income tax returns for years ended prior to 1987, respondent did not contend that the Black Motor formula employed by those petitioners incorrectly reflected the hospitals' bad debt experience. In some instances, respondent's agents required petitioners not using the Black Motor formula to employ that formula to compute their bad debt reserves. In accordance with the repeal of section 166(c), effective for the year ended 1987, petitioners could use only the specific charge-off method to deduct bad debts. Tax Reform Act of 1986, Pub. L. 99-514, sec. 805, 100 Stat. 2361-2362.

With the consolidated return for taxable year ended 1987, petitioners timely filed an application on Form 3115, Application for Change In Accounting Method, to elect the so-called nonaccrual-experience method[5] for taxable year ended 1987.

---

[4] (...continued)
permitted a deduction that was larger than the present value of the losses. See H. Rept. 99-426, at 577 (1985), 1986-3 C.B. (Vol. 2) 1, 577; S. Rept. 99-313, at 155 (1986), 1986-3 C.B. (Vol. 3) 1, 155. Pursuant to TRA sec. 805(a), 100 Stat. 2362, the positive sec. 481(a) adjustment relating to the repeal of the reserve method of accounting for bad debts was to be accounted for ratably over a 4-year spread period commencing with the year ended 1987.

[5] The nonaccrual-experience method provides that an accrual-method taxpayer generally does not have to accrue as gross income at the time the taxpayer normally would be required to recognize income with respect to an account receivable (i.e., at the time all events had occurred to fix the right to receive the income and the amount could be determined with reasonable accuracy) accounts receivable relating to services performed by the taxpayer that, based on experience, the taxpayer will not

(continued...)

Petitioners elected to use the periodic system[6] of the
nonaccrual-experience method to estimate on a hospital-by-
hospital basis the portion of their income they would not collect
(sometimes hereinafter referred to as the Uncollectible Amount),
except that petitioners computed the Uncollectible Amount by
using the formula (Original Formula)[7] set forth in section 1.448-
2T(e)(2)(i), Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June
16, 1987) (Original Temporary Regulations), rather than the
formula (Amended Formula) set forth in amended section 1.448-
2T(e)(2), Temporary Income Tax Regs., 53 Fed. Reg. 12513-12514
(Apr. 15, 1988) (Amended Temporary Regulations).  Hereinafter, we
sometimes will refer to the method petitioners used to compute
the Uncollectible Amount for years ended 1987 and 1988 as the
modified periodic system.

For taxable years ended 1987 and 1988, petitioners reduced
(or increased) income of each hospital by the sum of (1) net

---

[5]  (...continued)
collect.  Sec. 448(d)(5).  See infra pp. 17-21 for a detailed
description of the nonaccrual-experience method.  Pursuant to
sec. 1.448-2T(h)(1), Temporary Income Tax Regs., 52 Fed. Reg.
22776 (June 16, 1987), consent to a change to the nonaccrual-
experience method is granted automatically if the taxpayer is
qualified to use that method.

[6]  The periodic system of the nonaccrual-experience method,
described in Notice 88-51, 1988-1 C.B. 535, is similar to a
reserve system.  See infra pp. 20-21 for a detailed description
of the periodic system.

[7]  The parties agree that the Original Formula is identical to
the Black Motor formula.

writeoffs of bad debts (i.e., total bad debts written off during the year less any recoveries) and (2) the annual increase or decrease in the aggregate Uncollectible Amount (i.e., the aggregate amount that petitioners estimated would not be collected on accounts receivable outstanding at yearend) computed on the basis of the modified periodic system.  Respondent agrees that petitioners' reductions for net writeoffs of bad debts were proper but does not agree with petitioners' computation of the aggregate Uncollectible Amount.

For each petitioner qualified to use the nonaccrual-experience method, petitioners computed the amount of the negative section 481(a) adjustment relating to the change to that method to be equal to the Uncollectible Amount as of December 31, 1986, as calculated under the modified periodic system.[8]  In the case of those petitioners that had employed an overall accrual method of accounting for taxable years ended prior to January 1, 1987, each petitioner's negative section 481(a) adjustment relating to the change to the nonaccrual-experience method for taxable years ended 1987 and 1988 equaled the amount of the net positive section 481(a) adjustment relating to the repeal of the reserve method of accounting for those years.

[8]   In other words, petitioners calculated the portion of accounts receivable that would not be collected by multiplying yearend accounts receivable by the ratio of writeoffs for bad debts (adjusted for recoveries) for the current year and the 5 preceding years over the sum of the yearend accounts receivable balances for the same 6-year period.

In the case of those petitioners that had employed the hybrid method of accounting for taxable years ended prior to January 1, 1987, to the extent that the Uncollectible Amount was attributable to the use of the cash method for taxable years ended prior to January 1, 1987, each qualified petitioner reduced taxable income for each of the years ended 1987 and 1988 by one-tenth of the portion of accounts receivable estimated to be uncollectible as of December 31, 1986, using the modified periodic system. To the extent that the Uncollectible Amount was attributable to the use of an accrual method for taxable years ended prior to January 1, 1987, the Uncollectible Amount was equal to the net positive section 481(a) adjustment relating to the repeal of the reserve method of accounting for bad debts. As calculated by petitioners, for taxable years ended 1987 and 1988 the negative section 481(a) adjustment relating to the election of the nonaccrual-experience method was equal to the positive section 481(a) adjustment relating to the repeal of the reserve method of accounting for bad debts.

On audit, respondent disallowed all reductions in petitioners' taxable income attributable to the use of the nonaccrual-experience method, other than net writeoffs of bad debts for each year, on the grounds that petitioners had failed to provide documentation needed to compute the portion of petitioners' income earned from the performance of services and that they had not used the proper formula in applying the

nonaccrual-experience method.  Respondent's adjustments had the effect of disallowing petitioners' negative section 481(a) adjustment attributable to the election of the nonaccrual-experience method, but leaving unchanged the positive section 481(a) adjustment attributable to the repeal of the reserve method of accounting for bad debts.  Accordingly, respondent's adjustments increased petitioners' income for each of the years ended 1987 and 1988 by one-fourth of the positive section 481(a) adjustment attributable to the repeal of the reserve method of accounting for bad debts.

As calculated pursuant to the Black Motor formula, for taxable years ended 1987 and 1988, without taking into account the impact of the resolution of other issues raised in the notice of deficiency, the percentage of petitioners' yearend accounts receivable not accrued in income under the nonaccrual-experience method are 19.94 percent and 20.62 percent, respectively.

On their consolidated return for the taxable year ended 1987 as originally filed, HCA, as parent of the affiliated group, added $20 million to their consolidated income, and thereby reduced by that amount the aggregate Uncollectible Amount as determined under the modified periodic system.  Petitioners added the $20 million to their consolidated income to account for possible future corrections or adjustments to their nonaccrual-experience method computations following the issuance of final regulations or on audit.  In an amended consolidated return for

the taxable year ended 1987 (amended return) filed September 9, 1991, HCA claimed that it was entitled to reduce consolidated income, and thereby increase the aggregate Uncollectible Amount, by $20 million. On audit, respondent allowed the claimed $20 million reduction in consolidated income by offsetting the nonaccrual-experience method adjustment by that amount.

In the amended return, HCA also claimed that petitioners were entitled to a refund of tax based on a computational adjustment in the application of the nonaccrual-experience method for certain petitioners whose stock was sold, or whose assets were transferred to a subsidiary whose stock was sold, to HealthTrust, Inc.--The Hospital Corporation (HealthTrust) in September 1987. On petitioners' original return, the Original Formula was applied to those petitioners by using the accounts receivable as of the date of sale and by using the net writeoffs of bad debts from January 1, 1987, through the date of sale. In the amended return, the computation was made by annualizing the net writeoffs of bad debts for the period from January 1, 1987, through the date of the sale, thus increasing the Uncollectible Amount for the taxable year 1987 by $7,366,123.

Petitioners do not charge or otherwise require interest to be paid on their accounts receivable, they do not charge or otherwise impose any penalties for failing to pay an account receivable timely, and no portion of their accounts receivable was owed on account of activities with respect to either (1)

lending money or (2) acquiring receivables or other rights to receive payment from other persons.

Petitioner's hospitals make frequent use of various medical and surgical supply items and pharmaceuticals (hereinafter sometimes collectively referred to as medical supplies) in providing medical care to patients. Many of the medical supplies are used directly on a patient by a physician in the performance of a medical procedure, and others are used by nurses, attendants, and other medical personnel in the treatment of the patient. The quantities of items used, administered, or consumed and the timing of such use, administration, or consumption are determined by the physician or hospital staff, on some occasions after consultation with the patient.

Medical supplies may be applied to, implanted in, or otherwise administered to, furnished to, or used in connection with the treatment of patients. Examples of these medical supplies include casts, crutches, canes, walkers, bandages, sutures, splints, skin staples, various implants such as joint replacements, pacemakers, and heart valves, orthopedic devices, and physical and occupational therapy items. These items often leave the hospital with the patient, although some items such as sutures, splints, skin staples, and implants can be removed from the patient only by a physician or other trained medical personnel.

Medicines and prescription drugs frequently are administered to a patient during the course of treatment for the patient's condition. Intravenous solutions or blood and blood derivatives also may be administered to a patient. Medical supplies, moreover, may be used in performing surgical and other procedures on patients, including such items as scalpels and other surgical instruments, sponges, surgical drapes, surgical gowns, towels, syringes, alcohol preparations, drainage and irrigating tubes, and tourniquets.

Additionally, many ancillary hospital departments use medical supplies in the course of performing their particular specialties relating to patient hospital care. For example, x-ray film, chemicals, dyes, and nuclear materials are used in the course of performing radiological diagnostic procedures. Gases are administered to patients during surgery under the strict supervision of an anesthesiologist. Oxygen is administered to patients by the respiratory therapy department. Dyes are injected in patients with possible coronary artery disease during the diagnostic procedure known as cardiac catheterization. Psychiatric facilities sometimes use other medical supplies and equipment in certain treatments, such as insulin therapy, electroshock therapy, and hydrotherapy.

The hospitals employ sophisticated medical records systems to identify which medical supplies are used on or for each patient. The hospitals determine patient charge amounts for

listing on billing statements for many individual procedures involving a medical supply based on a schedule of algorithms that typically are a multiple of the cost of the supply item used or a multiple of the average wholesale price of the pharmacy item used.

At discharge, patients are furnished a summary bill that shows separate charge categories such as patient room charges, pharmacy, medical/surgical supplies, and laboratory. Upon request, the patient will receive a more detailed bill that itemizes each separate charge within the broad categories. The items listed on summary bills vary from patient to patient based on the exact medical care received by the patient. For example, the bill often identifies charges as being for the use of patient rooms and for various special areas, such as the operating room, recovery room, delivery room, nursery, emergency room, or intensive care unit. The bill also may identify charges for ancillary procedures such as radiology, anesthesia, nuclear medicine, various laboratory procedures, inhalation therapy, and physical therapy. Some specific charges on the detailed bill are identified by the name and/or code of a particular medication, supply item, or IV solution used in providing medical services to the patient.

Public or private insurance programs directly or indirectly pay 70 and 80 percent of the hospitals' bills to patients. Those insurance programs calculate payments to the hospitals on a flat

amount based on a particular procedure or on some other negotiated per-case or per diem basis. Thus, in most cases, the hospitals' itemized bills do not bear any particular relationship to the amounts that the hospitals actually will be paid for the services provided. See Hospital Corp. of America v. Commissioner, T.C. Memo. 1996-105, for a detailed description of the hospitals' billing practices and the insurers' payment policies.

## OPINION

An accrual method taxpayer generally must include a taxable amount in income when all events have occurred that fix the right to receive the income and the amount can be determined with reasonable accuracy. Sec. 1.451-1(a), Income Tax Regs. Section 448(d)(5),[9] however, provides that an accrual-method taxpayer is not required to accrue income earned by the taxpayer with respect to the performance of services which, based on experience, it will not collect (i.e., the Uncollectible Amount) and for which no interest is charged or no penalty is applied for overdue

---

[9]  Sec. 448(d)(5) provides as follows:

> (5) Special rule for services.--In the case of any person using an accrual method of accounting with respect to amounts to be received for the performance of services by such person, such person shall not be required to accrue any portion of such amounts which (on the basis of experience) will not be collected. This paragraph shall not apply to any amount if interest is required to be paid on such amount or there is any penalty for failure to timely pay such amount.

receivables. The nonaccrual-experience method is treated as a method of accounting. Sec. 1.448-2T(b), Temporary Income Tax Regs., 52 Fed. Reg. 22774-22775 (June 16, 1987).

The Positions of the Parties

Petitioners contend that the Amended Temporary Regulations are invalid because they are inconsistent with the plain meaning of section 448(d)(5). Petitioners maintain that Congress expressly authorized use of the Black Motor formula to compute the Uncollectible Amount. Additionally, petitioners contend that their accounts receivable are derived entirely from the performance of services and, as a result, the Uncollectible Amount should be determined with respect to all of their accounts receivable. Petitioners further assert that, for those petitioners which had short taxable years for 1987 because their stock was sold, the Black Motor formula must be applied in conjunction with the periodic system by annualizing the writeoffs of bad debts to avoid a distortion for that year.

Respondent contends, on the other hand, that the Amended Formula is taken directly from the legislative history of section 448 and is consistent with the statute's plain language, origin, and purposes. Respondent maintains that the Amended Regulations are a valid interpretation of congressional intent and properly compute the Uncollectible Amount. Additionally, respondent contends that the hospitals sell substantial amounts of medical supplies to their patients in addition to performing services.

Respondent maintains that petitioners' records do not properly allocate accounts receivable between income earned from the sale of services and income earned from the sale of inventory; therefore, petitioners cannot use the nonaccrual-experience method because they cannot establish the portion of their income that is derived solely from the performance of services.

The question is one of first impression.

The Nonaccrual-Experience Method Formula

The temporary regulations apply the nonaccrual-experience method formula to each separate trade or business of a taxpayer. Sec. 1.448-2T(e)(1), Temporary Income Tax Regs.,[10] 52 Fed. Reg.

---

[10]    Sec. 1.448-2T(e), Temporary Income Tax Regs., as amended, provides in pertinent part as follows:

> (e) Use of experience to estimate uncollectible amounts--(1) In general.  In determining the portion of any amount due which, on the basis of experience, will not be collected, the formula prescribed by paragraph (e)(2) of this section shall be used by the taxpayer with respect to each separate trade or business of the taxpayer.  No other method or formula may be used by a taxpayer in determining the uncollectible amounts under this section.

> (2) Six-year moving average--(i) General rule.  For any taxable year the uncollectible amount of a receivable is the amount of that receivable which bears the same ratio to the account receivable outstanding at the close of the taxable year as (A) the total bad debts (with respect to accounts receivable) sustained throughout the period consisting of the taxable year and the five preceding taxable years (or, with the approval of the Commissioner, a shorter period), adjusted for recoveries of bad debts during such period, bears to (B) the sum of the accounts receivable earned throughout the entire six (or fewer) taxable

(continued...)

22775 (June 16, 1987).  No other method or formula may be used to

---

10  (...continued)
year period (i.e., the total amount of sales resulting
in accounts receivable) throughout the period.
Accounts receivable described in paragraphs (c) [any
amounts due for which interest or penalties are
charged] and (d) [any amounts not earned by the
taxpayer for services performed by the taxpayer] of
this section are not taken into account in computing
the ratio.

(ii) Period of less than six years.  A period
shorter than six years generally will be appropriate
only if there is a change in the type of a substantial
portion of the outstanding accounts receivable such
that the risk of loss is substantially increased. * * *

*      *      *      *      *      *      *

(3) Mechanics of nonaccrual-experience method.
The nonaccrual-experience method shall be applied with
respect to each account receivable of the taxpayer
which is eligible for such method.  With respect to a
particular account receivable, the taxpayer will
determine, in the manner prescribed in paragraph (e) of
this section, the amount of such account receivable
that is not expected to be collected.  Such
determination shall be made only once with respect to
each account receivable, regardless of the term of such
receivable.  The estimated uncollectible amount shall
not be recognized as gross income.  Thus, the amount
recognized as gross income shall be the amount that
would otherwise be recognized as gross income with
respect to the account receivable, less the amount
which is not expected to be collected.  Upon the
collection of the account receivable, additional gross
income shall be recognized with respect to the
collection of any amount not initially expected to be
collected.  Similarly, no bad debt deduction under
section 166 for a wholly or partially worthless account
receivable shall be allowed for any amount not
previously taken into income under the nonaccrual-
experience method. [Sec. 1.448-2T(e), Temporary Income
Tax Regs., 52 Fed. Reg. 22774-22775 (June 16, 1987), as
amended by T.D. 8194, 1988-1 C.B. 186.]

calculate the Uncollectible Amount pursuant to the temporary regulations.  Id.

The Separate Receivable System of the Nonaccrual-Experience Method

The so-called separate receivable system provided in the temporary regulations applies the nonaccrual-experience method to each account receivable which is eligible for that method.  Sec. 1.448-2T(e)(3), Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June 16, 1987).  For any eligible receivable, the taxpayer includes in gross income only the amount of that receivable that is recognized as gross income minus the Uncollectible Amount. The Uncollectible Amount of any receivable is the amount of the receivable outstanding at the close of the taxable year multiplied by a percentage.  The Amended Formula provides for the determination of the percentage by dividing (a) total bad debts (adjusted for recoveries) sustained during the current and 5 preceding taxable years (or a shorter period with the approval of the Commissioner) by (b) the sum of the accounts receivable earned throughout that same 6-year (or shorter) period. Accordingly, the Amended Formula provides for the determination of the denominator of the fraction on the basis of total sales resulting in accounts receivable throughout the applicable period.  Sec. 1.448-2T(e)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 12513-12514 (Apr. 15, 1988).  A taxpayer which has been in existence for less than 6 years is to use its experience for

the current year and the actual number of preceding taxable years. The taxpayer may use a predecessor's experience from preceding taxable years. Sec. 1.448-2T(e)(2)(iii), Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June 16, 1987).

The separate receivable system provides for the determination of the Uncollectible Amount only once for each account receivable, regardless of the term of that receivable. Sec. 1.448-2T(e)(3), Temporary Income Tax Regs., supra. As each receivable is collected, income is reported only to the extent not previously accrued. If a receivable is not collected, the bad debt deduction is limited to the amount previously reported as income. Id.

### The Periodic System of the Nonaccrual-Experience Method

Alternatively, a taxpayer may elect the so-called periodic system for applying the nonaccrual-experience method. Notice 88-51, 1988-1 C.B. 535; see H. Rept. 99-426, at 608 (1985), 1986-3 C.B. (Vol. 2) 1, 608. The periodic system requires a taxpayer to establish an account which represents the aggregate amount of accounts receivable in a trade or business eligible for the nonaccrual-experience method that the taxpayer estimates will not be collected, based on the 6-year moving average formula set forth in section 1.448-2T(e)(2)(i), Temporary Income Tax Regs., supra, and Notice 88-51, 1988-1 C.B. at 536. At yearend, the taxpayer adjusts the account to reflect the aggregate amount that the taxpayer estimates will not be collected on the accounts

receivable outstanding at that time.  Income is increased to reflect any decrease in the reserve balance or decreased to reflect any increase in that balance.  Notice 88-51, 1988-1 C.B. at 536.  Accordingly, the periodic system of the nonaccrual-experience method of accounting is somewhat similar to a reserve method.  Id.

The periodic system requires the taxpayer to charge wholly or partially worthless accounts receivable directly to bad debt expense, ignoring the Uncollectible Amounts pertaining to those accounts receivable.  Similarly, the taxpayer must disregard the Uncollectible Amounts of accounts receivable when it accounts for the collection of those receivables.  Id.  The 6-year moving average formula is used to estimate the total amount of all eligible accounts receivable outstanding at yearend that the taxpayer estimates it will not collect, including accounts receivable outstanding at the end of prior taxable years.  Id.

Is Section 448(d)(5) Ambiguous?

Petitioners contend that the Amended Regulations are invalid because they are an unreasonable interpretation of an unambiguous statutory provision.  In response, respondent contends that the statute is ambiguous in that it does not specify how "experience" is to be determined.  Respondent contends further that the Amended Regulations are a valid interpretation of the statute.

In construing section 448(d)(5) our task is to give effect to the intent of Congress.  We begin with the statutory language,

which is the most persuasive evidence of the statutory purpose. United States v. American Trucking Associations, Inc., 310 U.S. 534, 542-543 (1940); Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 93-94 (1934); General Signal Corp. & Subs. v. Commissioner, 103 T.C. 216, 240 (1994), supplemented by 104 T.C. 248 (1995). Ordinarily, the plain meaning of statutory language is conclusive. United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-242 (1989).

Where a statute is silent or ambiguous, we look to legislative history in an effort to ascertain congressional intent. Burlington No. R.R. v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); United States v. American Trucking Associations, Inc., supra at 543-544; Peterson Marital Trust v. Commissioner, 102 T.C. 790, 799 (1994), affd. 78 F.3d 795 (2d Cir. 1996); U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 184 (1987), affd. 865 F.2d 750 (6th Cir. 1989). Even where the statutory language appears to be clear, we are not precluded from consulting legislative history. United States v. American Trucking Associations, Inc., supra at 543-544. Nevertheless, our authority to construe a statute is limited where the agency charged with administering that statute has promulgated regulations thereunder.

The limitation on our authority is found in the so-called Chevron rule as stated in the following passage:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. [Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984); fn. refs. omitted.]

See also NationsBank v. Variable Annuity Life Ins. Co., 513 U.S. ___, 115 S. Ct. 810, 813 (1995); Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 647-648 (1990). The Supreme Court further has stated that a reviewing court

need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding. [Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra at 843 n.11; citations omitted.]

Accordingly, "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.'" NationsBank v. Variable Annuity Life Ins. Co., 513 U.S. at ___, 115 S. Ct. at 813-814. Despite the fact that the Chevron rule "has had a checkered career in the tax arena", Central Pa. Sav. Association v. Commissioner, 104 T.C. 384, 391-392 (1995), the Court of Appeals for the Sixth

Circuit, to which an appeal of the instant case would lie absent stipulation of the parties to the contrary, has stated that where "Congress has not directly spoken to the precise question at issue, the [Chevron] rule * * * should be applied".  Peoples Fed. Sav. & Loan Association v. Commissioner, 948 F.2d 289, 299 (6th Cir. 1991), revg. T.C. Memo. 1990-129.  "If there are gaps left by silence or ambiguity of the statutes in question, agencies may fill the gaps with necessary rules, providing they are reasonable, and courts should not interfere with this process." Id. at 300.

Petitioners maintain that the phrase "on the basis of experience" is not defined in the statute and that Congress did not delegate to the Commissioner the authority to define the phrase.  Petitioners assert further that no definition is necessary because the phrase is not ambiguous and must be interpreted in accordance with its plain, everyday meaning.  We conclude, however, that the phrase is ambiguous.

The words in a revenue act generally should be interpreted in their ordinary, everyday sense.  Commissioner v. Soliman, 506 U.S. 168, 174 (1993).  Webster's II New Riverside University Dictionary (1984) defines "experience" as "An event or series of events participated in" or "The totality of such events in the past of an individual or group."  We do not find in that definition a clear mechanism for determining how a taxpayer's bad debt experience will be utilized to calculate the uncollectible

portion of a receivable. The statute on its face, furthermore, provides no formula for calculating that amount. Petitioners, however, in essence argue that, when the Code employs the word "experience" in conjunction with bad debts, the word has a predetermined meaning which prescribes the formula that must be used to calculate the uncollectible portion of an amount owed a taxpayer.

In that regard, petitioners contend that Congress explicitly recognized that the term "experience" as it relates to bad debt experience is synonymous with the Black Motor formula. We have found no cases, and petitioners have cited none, where the term "experience" was found to have the technical meaning advanced by petitioners. Moreover, section 448 does not define the word in that manner. In support of their contention petitioners cite section 585(b)(2),[11] which describes "the experience method" that

---

[11] Sec. 585, as amended by sec. 11801(c)(12) of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388-527, provides in pertinent part as follows:

SEC. 585. RESERVES FOR LOSSES ON LOANS OF BANKS.

(a) Reserve for Bad Debts.--

(1) In general.--Except as provided in subsection (c), a bank shall be allowed a deduction for a reasonable addition to a reserve for bad debts. Such deduction shall be in lieu of any deduction under section 166(a).

*       *       *       *       *       *       *

(b) Addition to Reserves for Bad Debts.--
                                        (continued...)

[11] (...continued)

       (1) General rule.--For purposes of subsection (a), the reasonable addition to the reserve for bad debts of any financial institution to which this section applies shall be an amount determined by the taxpayer which shall not exceed the addition to the reserve for losses on loans determined under the experience method as provided in paragraph (2).

       (2) Experience method.--The amount determined under this paragraph for a taxable year shall be the amount necessary to increase the balance of the reserve for losses on loans (at the close of the taxable year) to the greater of--

       (A) the amount which bears the same ratio to loans outstanding at the close of the taxable year as (i) the total bad debts sustained during the taxable year and the 5 preceding taxable years (or, with the approval of the Secretary, a shorter period), adjusted for recoveries of bad debts during such period, bears to (ii) the sum of the loans outstanding at the close of such 6 or fewer taxable years, or

       (B) the lower of--

       (i) the balance of the reserve at the close of the base year, or

       (ii) if the amount of loans outstanding at the close of the taxable year is less than the amount of loans outstanding at the close of the base year, the amount which bears the same ratio to loans outstanding at the close of the taxable year as the balance of the reserve at the close of the base year bears to the amount of loans outstanding at the close of the base year.

For purposes of this paragraph the base year shall be the last taxable year before the most recent adoption of the experience method, except that for taxable years beginning after 1987 the base year shall be the last taxable year beginning before 1988.

(continued...)

qualified banks use to determine the maximum amount they may add to their reserves for bad debts.  Petitioners assert, and respondent does not dispute, that the experience method described in section 585(b)(2) and section 1.585-2(c)(1), Income Tax Regs., is identical to the Black Motor formula.

Petitioners seemingly would have us conclude from the foregoing that the word "experience" in section 448(d)(5) has the same meaning as the term "experience method" in section 585.  We, however, do not agree that Congress' use of the word "experience" in section 448(d)(5) necessarily shows congressional intent that the Uncollectible Amount be calculated under the Black Motor formula.  Indeed, we think that it is more probable that, if Congress had intended the same formula to apply in section 448(d)(5) and in section 585, then it would have specified that the Uncollectible Amount be based on "the experience method" or on "the Black Motor formula".  The use of the word "experience" in section 448(d)(5) and the words "experience method" in section 585 may reasonably be viewed as an indication of two different meanings.  Cf. Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 38-41 (1995).

In sum, we do not find that the statutory language manifests congressional intent as to what method is to be employed to calculate the Uncollectible Amount, and we conclude that section

---

[11]  (...continued)

448(d)(5) is ambiguous as to the meaning of "experience".  We next look to the statute's legislative history in an attempt to ascertain congressional intent.

Does the Legislative History Clearly Reveal Congressional Intent as to the Formula To Apply?

Petitioners maintain that the legislative history of section 448(d)(5) does not clearly reveal Congress' intent as to the proper formula to apply.  A description of the nonaccrual-experience method formula is contained only in the report of the Committee on Way and Means.[12]  Because that report contains conflicting language, we do not think it clearly describes the formula.  H. Rept. 99-426, at 608 (1985), 1986-3 C.B. (Vol. 2) 1, 608, states in pertinent part as follows:

Amount of accrual

The committee bill provides that an accrual basis taxpayer need not accrue as income any portion of amounts billed for the performance of services which, on the basis of experience, it will not collect. * * *

The amount of billings that, on the basis of experience, will not be collected is equal to the total amount billed, multiplied by a fraction whose numerator is the total amount of such receivables which were billed and determined not to be collectible within the most recent five years taxable years [sic] of the

---

[12]    A provision comparable to sec. 448(d)(5) was not present in the Senate amendment, and the conference report does not describe the nonaccrual-experience method formula.  See H. Conf. Rept. 99-841 (Vol. 2), at II-285 to II-289 (1986), 1986-3 C.B. (Vol. 4) 1, 285-289.

taxpayer, and whose denominator is the total of such amounts billed within the same five year period. If the taxpayer has not been in existence for the prior five taxable years, the portion of such five year period which the taxpayer has been in existence is to be used.

For example, assume that an accrual-basis taxpayer has $100,000 of receivables that have been created during the most recent five taxable years. Of the $100,000 of accounts receivable, $1,000 have been determined to be uncollectible. The amount, based on experience, which is not expected to be collected is equal to 1 percent ($1,000 divided by $100,000) of any receivable arising from the provision of services that are outstanding at close of the taxable year. [Emphasis added; fn. ref. omitted.]

As the foregoing emphasized language reveals, one paragraph of the committee report specifies that the Uncollectible Amount is calculated by multiplying the total amount billed during the taxable year by the ratio of the sum of the amount of those billings determined uncollectible within the most recent 5 taxable years to the sum of the billings within that same 5-year period. In the example in the following paragraph, however, the formula is expressed somewhat differently; to wit, in the example, the Uncollectible Amount is calculated by multiplying the receivables outstanding at the close of the taxable year by the ratio of the amount of those billings determined uncollectible within the most recent 5 taxable years to the sum of the billings within that same 5-year period. In our view, the committee report merely suggests that Congress intended eligible taxpayers to employ a method to determine statistically the

Uncollectible Amount that was similar, but not identical, to the Black Motor formula. Consequently, we do not find the legislative history to clearly reveal Congress' intent as to the method of calculating the Uncollectible Amount. In the absence of a clear indication of congressional intent on the precise question in issue, our next task is to decide whether the temporary regulations[13] promulgated under section 448(d)(5) are a permissible construction of the statute.

Are the Amended Regulations a Permissible Construction of the Statute?

To be valid, section 1.448-2T(e)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 12513-12514 (Apr. 15, 1988), need not be the only, or even the best, construction of section 448(d)(5). Rather, the Amended Regulations need only be a reasonable interpretation of congressional intent. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 843; Peoples Fed. Sav. & Loan Association v. Commissioner, 948 F.2d at 299-300. "The choice among reasonable interpretations is for the Commissioner, not the courts." National Muffler Dealers Association v. United States, 440 U.S. 472, 488 (1979); see also

---

[13] Temporary regulations are entitled to the same weight as final regulations. Peterson Marital Trust v. Commissioner, 102 T.C. 790, 797 (1994), affd. 78 F.3d 795 (2d Cir. 1996); see also Truck & Equip. Corp. v. Commissioner, 98 T.C. 141, 149 (1992); Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765, 776 (1987); Zinniel v. Commissioner, 89 T.C. 357, 369 (1987).

United States v. Correll, 389 U.S. 299, 306-307 (1967); Udall v.

Tallman, 380 U.S. 1, 16-17 (1965).

The Original Formula as promulgated in section 1.448-

2T(e)(2)(i), Temporary Income Tax Regs., 52 Fed. Reg. 22775 (June

16, 1987), used the Black Motor formula to determine the

Uncollectible Amount.[14]  The Original Formula provides that the

Uncollectible Amount would be calculated as follows:

| Uncollectible amount of a receivable | = | Accounts receivable outstanding at yearend | x | **Total bad debts with respect to accounts receivable sustained during the current tax year and 5 preceding tax years less <u>recoveries of bad debts during that period</u> sum of the accounts receivable at yearend for the same 6-year period** |
|---|---|---|---|---|

---

[14]    As originally promulgated, sec. 1.448-2T(e)(2)(i), Temporary
Income Tax Regs., read as follows:

> (2) <u>Six-year moving average</u>--(i) <u>General rule.</u>
> For any taxable year the uncollectible amount of a
> receivable is the amount which bears the same ratio to
> the accounts receivable outstanding at the close of the
> taxable year as (A) the total bad debts with respect to
> accounts receivable sustained during the period
> consisting of the taxable year and the five preceding
> taxable years (or with the approval of the
> Commissioner, a shorter period), adjusted for
> recoveries of bad debts during such period, bears to
> (B) the sum of the accounts receivable at the close of
> such six (or fewer) taxable years.  Accounts receivable
> described in paragraphs (c) [amounts due for which
> interest is required to be paid, or for which there is
> any penalty for failure to timely pay any amounts due]
> and (d) [accounts receivables related to amounts not
> earned by the taxpayer through the performance of
> services by the taxpayer] of this section are not taken
> into account in computing the ratio. [Sec. 1.448-
> 2T(e)(2)(i), Temporary Income Tax Regs., 52 Fed. Reg.
> 22775 (June 16, 1987)].

In contrast, the Amended Formula promulgated in section 1.448-2T(e)(2)(i), Temporary Income Tax Regs., <u>supra</u>, provides for the Uncollectible Amount to be calculated as follows:

| Uncollectible amount of a receivable | = | Accounts receivable outstanding at yearend | x | Total bad debts with respect to accounts receivable sustained during the current tax year and 5 preceding tax years less <u>recoveries of bad debts during that period</u> sum of accounts receivable earned (i.e., total sales) for the same 6-year period |
|---|---|---|---|---|

The substantive difference between the Original Formula and the Amended Formula is the substitution in the denominator of the multiplier of (1) the sum of <u>accounts receivable earned</u> (i.e., total sales resulting in accounts receivable) throughout the 6-year moving average period for (2) the sum of the <u>yearend accounts receivable</u> for each year during that 6-year period.

One theme recurring throughout petitioners' challenge to the validity of the Amended Regulations is that the Amended Formula is defective because it does not use the <u>Black Motor</u> formula to calculate the Uncollectible Amount. Neither the statute nor its legislative history, however, contains anything which leads us to conclude that Congress intended such a result.

We are not persuaded by petitioners' argument that, inasmuch as the Original Formula is premised on the <u>Black Motor</u> formula, the Secretary must have initially read the legislative history in the same manner as suggested by petitioners. Under the circumstances of the instant case where the Secretary acted quickly--within 10 months of promulgation of the Original Temporary Regulations--to amend temporary regulations that he

concluded erroneously interpreted the statute, he was entitled to alter his interpretation of the statute on further reflection. Rust v. Sullivan, 500 U.S. 173, 186 (1991); Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra at 862; Peoples Fed. Sav. & Loan Association v. Commissioner, supra at 302.

The Secretary's rationale for the amendment to the nonaccrual-experience formula is revealed in the preamble to the Secretary's Decision announcing the modification:

> Under the nonaccrual-experience method of accounting, the portion of a receivable that is considered uncollectible and not required to be accrued is the product of the receivable and a fraction representing the taxpayer's bad debt experience. The numerator of the fraction is the taxpayer's bad debts for the taxpayer's current and five preceding taxable years, and the denominator of the fraction is the taxpayer's accounts receivable for the same six-year period. The Internal Revenue Service has received questions from taxpayers as to whether the denominator of the fraction is determined on the basis of (i) total accounts receivable earned throughout the six-year period (i.e., the total amount of sales resulting in accounts receivable throughout the period) or (ii) yearend balances of the accounts receivable over the six-year period. These regulations provide that the denominator is based on total accounts receivable earned throughout the period ending at the close of the six-year period. This interpretation is consistent with the legislative history of the Act which provides that "[t]he amount of billings that, on the basis of experience, will not be collected is equal to the total amount billed, multiplied by a fraction whose numerator is the total amount of such receivables which were billed and determined not to be collectible within the most recent five taxable years of the taxpayer, and whose denominator is the total of such amounts billed within the same five year period." H.R. Rep. No. 99-426, 99th Cong., 1st Sess. 606 (1985). [T.D. 8194, 1988-1 C.B. 186.[15]]

---

[15] Additionally, as stated above, petitioners agree that the relevant legislative history is ambiguous.

As shown by the foregoing statement, the Secretary reconsidered the Original Temporary Regulations and the legislative history as a result of questions from taxpayers as to the proper formula to use to calculate the Uncollectible Amount which arose following release of the Original Temporary Regulations.  A review of H. Rept. 99-426, at 608 (1985), 1986-3 C.B. (Vol. 2) 1, 608, reveals that <u>the multiplier</u> delineated in the Amended Formula is consistent with <u>the multiplier</u> described in the committee report.  Accordingly, we conclude that the Secretary's formulation of the multiplier in the Amended Formula is reasonable.  Whether the Secretary's framing of the multiplicand is reasonable, however, requires further analysis.

In both the Original Formula and the Amended Formula, the multiplicand is described as the accounts receivable outstanding at yearend.  As we explained, however, see <u>supra</u> pp. 28-29, the description of the multiplicand in the committee report is inconsistent.  There, the multiplicand is defined both as <u>the total amount billed</u> and as <u>the receivables outstanding at the close of the taxable year</u>.

Petitioners contend that the Amended Formula compares two sets of incomparable data.  They maintain that a comparison of past bad debts for the current year and 5 preceding years to past total charge transactions, which includes charge transactions that are collected in the same year billed as well as amounts not yet collected, can only predict bad debts in total current charge

transactions, not in yearend receivables.  According to petitioners, measuring the historical relationship between annual bad debt writeoffs (net of recoveries) and total annual charges may be appropriate for estimating the portion of annual charges that are not likely to be collected but not for purposes of estimating the portion of yearend accounts receivable that probably will not be collected.  Petitioners contend that the Amended Formula produces incorrect results and is contrary to the language and purpose of section 448(d)(5) because it requires the hospitals to accrue as income amounts which, based on experience, they will not collect.[16]

Petitioners assert that the Black Motor formula reasonably reflects their bad debt experience and should be applied in the instant case.  Petitioners maintain that the Black Motor formula was intended to provide an estimate of future uncollectibility based on the taxpayer's actual recent collection experience.

---

[16]    According to petitioners, their tax department calculated that petitioners' actual bad debt experience with respect to accounts receivable outstanding at the end of 1990 shows that approximately 21.4 percent of those accounts receivable was uncollectible during 1991 and 1992.  Moreover, with respect to accounts receivable outstanding as of specified dates in 1987, approximately 19 percent of those receivables was uncollectible within a period of 1 year, and approximately 22 percent to 24 percent would become uncollectible within 2 years.  In contrast, petitioners contend, the Amended Formula produces exclusion ratios of between 3.4 percent and 5.3 percent of revenue for taxable year ended 1987 and between 2.6 percent and 4.0 percent of revenue for taxable year ended 1988, depending upon whether gross billings, billings net of contractual adjustments, or billings exclusive of Medicare and Medicaid billings are used to approximate annual charge transactions.

They assert that the <u>Black Motor</u> formula was merely a tool for determining a taxpayer's bad debt experience and was not mandatory for all circumstances. Petitioners contend that, to correctly apply the <u>Black Motor</u> formula, the regulations should allow modifications or departures for particular facts and circumstances. The foregoing arguments indicate that petitioners use the term "<u>Black Motor</u> formula" to mean the reserve method of accounting for bad debts that was in effect prior to repeal of section 166(c) as well as the mathematical formula specified in the case from which the method derives it name. See <u>Black Motor Co. v. Commissioner</u>, 41 B.T.A. 300, 302 (1940), affd. on another issue 125 F.2d 977 (6th Cir. 1942).

As we view their position, petitioners essentially would prefer to substitute for the nonaccrual-experience method provided by Congress the reserve method of accounting for bad debts that was in effect prior to repeal of section 166(c) whereby the addition to the bad debt reserve was based on a reasonable amount determined by the taxpayer, with the reasonableness of that addition tested generally under the <u>Black Motor</u> formula. See <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 546 (1979); <u>Black Motor Co. v. Commissioner</u>, <u>supra</u>. That result, however, is not consistent with the statute. Nothing in the statute or the legislative history requires the Uncollectible Amount to equal the amount that would have been calculated

pursuant to either the reserve method of accounting or under the Black Motor formula.

We also do not agree that the result under the Amended Formula is not determined on the basis of the hospitals' experience. The formula utilizes the bad debt history and accounts receivable of the hospitals, not some fictional entity.

Petitioners contend further that section 448(d)(5) does not authorize the prescription of a single formula to be used by all taxpayers. They argue that prescribing a single fixed formula is inconsistent with the notion of making a determination "on the basis of experience" and represents an inappropriate departure from the plain, everyday meaning of the language of section 448(d)(5) because it results in income being accrued on a basis other than the taxpayer's actual experience.

We do not agree with petitioners that the temporary regulation is invalid because it provides one formula to be applied by all taxpayers to determine the Uncollectible Amount. Although the legislative history of section 448(d)(5) is not without ambiguity as to the specific formula to be utilized, the description of the nonaccrual-experience method in the House report suggests a congressional preference for a fixed formula for calculating the Uncollectible Amount. See H. Rept. 99-426, at 608 (1985), 1986-3 C.B. (Vol. 2) 1, 608. The ambiguity in the legislative history does not arise because the report fails to use a fixed formula but because it describes that fixed formula

in two different ways.  Although the <u>Black Motor</u> formula is a conceivable method for calculating the Uncollectible Amount, and perhaps even a better choice, it is not the only possible method, and it is not even one of the two versions of the formula that is described in H. Rept. 99-426, <u>supra</u> at 608, 1986-3 C.B. (Vol. 2) at 608.  Under the circumstances, we must defer to the Secretary's choice of formula if the method he selected is reasonable.  <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 843; <u>Peoples Fed. Sav. & Loan Association v. Commissioner</u>, 948 F.2d at 299-300; see also <u>National Muffler Dealers Association v. United States</u>, 440 U.S. at 488; <u>United States v. Correll</u>, 389 U.S. at 306-307.

Petitioners further argue essentially that the Amended Formula cannot be valid because the formula does not equal the hospitals' actual bad debt writeoff experience.  We do not believe that section 448(d)(5) requires an exact matching of the Uncollectible Amount with a taxpayer's actual bad debt writeoff experience.  A statistical approximation of the Uncollectible Amount determined under the prescribed formula appears to be all that was contemplated by Congress.  See H. Rept. 99-426, <u>supra</u> at 608, 1986-3 C.B. (Vol. 2) at 608, H. Conf. Rept. 99-841 (Vol. 2), at II-288 (1986), 1986-3 C.B. (Vol. 4) 1, 288.  As to the nonaccrual-experience method, the conference report states the following:

Effective date

The provision of the conference agreement is effective for taxable years beginning after December 31, 1986. * * * Any adjustment required by section 481 as a result of such change * * * [from the cash method to the accrual method of accounting] generally shall be taken into account over a period not to exceed four years. It is the intent of the conferees that this apply to all changes resulting from the provision, including any changes necessitated by the rule that certain accrual taxpayers, including taxpayers presently on the accrual method of accounting, need not recognize income on amounts statistically determined not to be collectible. [H. Conf. Rept. 99-841 (Vol. 2), supra at II-288, 1986-3 C.B. (Vol. 4) at 288, emphasis added.]

In the Amended Formula, the multiplicand conforms to one of two multiplicands described in the legislative history. See H. Rept. 99-426, supra at 608, 1986-3 C.B. (Vol. 2) at 608. The Amended Formula, furthermore, effectuates the purpose of the statute. Accordingly, the Secretary's choice of multiplicand is a permissible construction of section 448(d)(5). Consequently, under the Chevron rule, we must defer to that construction. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., supra at 843; Peoples Fed. Sav. & Loan Association v. Commissioner, supra at 299-300. For the foregoing reasons, we conclude that the Amended Temporary Regulations are valid.

Is the Periodic System of the Nonaccrual-Experience Method Valid?

The periodic system of the nonaccrual-experience method is not described in section 448(d)(5) or in the legislative history. H. Rept. 99-426, supra at 608, 1986-3 C.B. (Vol. 2) at 608,

however, specifies that "the Secretary of the Treasury may provide a periodic system of accounting for billings that, on the basis of experience, will not be collected where the periodic system results in the same taxable income as would be the case were each receivable recorded separately."  In Notice 88-51, 1988-1 C.B. 535, the Commissioner published the periodic system as an alternative to the separate receivable system under section 1.448-2T(e)(3), Temporary Income Tax Regs., 53 Fed. Reg. 12513-12514 (Apr. 15, 1988).

Petitioners assert that the periodic system provided by the Commissioner uses an inappropriate formula to estimate the portion of yearend accounts receivable that a taxpayer will not collect.  Petitioners argue that, to prevent an incorrect result, a formula applied to yearend accounts receivable balances must be based on the relationship of writeoffs to yearend accounts receivable balances, not the relationship of writeoffs to annual charges.  Accordingly, petitioners' challenge to the periodic system is premised on their contention that the Amended Formula, on which the periodic system is based, is invalid.  We already have concluded that the Amended Formula is a permissible construction of section 448(d)(5).  Accordingly, we conclude that the periodic system of the nonaccrual-experience method is reasonable and, therefore, valid.

Respondent contends, however, that, inasmuch as petitioners did not follow the periodic system described in Notice 88-51, supra, they must use the separate receivable system described in the Amended Regulations. We do not agree that, under the circumstances present in the instant case, petitioners should be denied the use of the periodic system merely because they challenged the validity of the formulation of the nonaccrual-experience method formula. Nor do we read Notice 88-51, supra, as requiring such a result. Based on the foregoing, we conclude that petitioners may use the periodic system of the nonaccrual-experience method, but they must calculate the Uncollectible Amount under the Amended Formula, not under the Original Formula.

Because we conclude that the Black Motor formula is not mandated under section 448(d)(5), we do not address petitioners' further argument that they should be allowed to annualize the actual bad debt writeoff experience of the corporations that were sold to HealthTrust during 1987 in order to calculate properly the Uncollectible Amount for 1987 using the Black Motor formula.

To What Income Is the Formula To Be Applied?

Additionally, respondent contends that in substance the hospitals "sell" medical supplies to their patients. Respondent maintains that income attributable to such sale of medical supplies is not eligible for the nonaccrual-experience method. Respondent asserts further that petitioners' records do not

adequately delineate accounts receivable arising from the sale of medical _services_ from accounts receivable arising from the sale of medical _supplies_ and, therefore, it is not possible to segregate the hospitals' income between income earned from the performance of services and income earned from the sale of medical supplies. As a result, respondent argues, petitioners may not utilize the nonaccrual-experience method for taxable years ended 1987 and 1988.

Petitioners counter that the nonaccrual-experience method is applicable to all of their accounts receivable because all of their income is derived from the performance of services. Alternatively, they contend that, even if a portion of their accounts receivable is derived from the sale of medical supplies, petitioners nevertheless are entitled to use the nonaccrual-experience method with respect to that portion of their income which is derived from the performance of services.

The nonaccrual-experience method is applicable only to amounts to be received for the performance of services. Sec. 448(d)(5). Neither the Code nor the regulations promulgated thereunder define what constitutes the performance of services for purposes of section 448(d)(5). Presumably, the performance of services would include activities in the fields of health, law, engineering, architecture, accounting, actuarial science, performing arts, and consulting. See sec. 448(d)(2) (defining a

personal service corporation for which section 448(b)(2) grants an exception to the general prohibition by section 448(a) of the use of the cash method of accounting by C corporations, partnerships which have a C corporation as a partner, and tax shelters).[17]

Relying on certain State law cases, respondent contends that the trend is to consider hospital services as part of sale transactions involving medical supplies. According to respondent: "This case law endeavors to protect the patient from defective hospital services, since the patient is unable to discern or control defective services and because physicians are depending on the hospital's services in undertaking the patient's treatment." Respondent thus asserts that any medical services accompanying a "sale" of medical supplies is part of the "sale" transaction.

Petitioners deny that the hospitals engage in the sale of medical supplies. They argue that the hospitals use medical supplies in the course of providing medical services, but they maintain that all of their income is derived from the performance of services. Petitioners contend that the business of operating

---

[17] For purposes of sec. 448(d)(2), the performance of services in the field of health means the provision of medical services by physicians, nurses, dentists, and other similar healthcare professionals. Sec. 1.448-1T(e)(4)(ii), Temporary Income Tax Regs., 52 Fed. Reg. 22768 (June 16, 1987). In the instant case, respondent does not deny that the hospitals perform services in the field of health.

hospitals is the quintessential service business.  They argue that this Court recognized that principle in St. Luke's Hosp. v. Commissioner, 35 T.C. 236 (1960), as did the Supreme Court in Abbott Labs. v. Portland Retail Druggists Association, Inc., 425 U.S. 1 (1976), and the Commissioner in the regulations. Petitioners maintain that hospitals do not sell merchandise but rather acquire medical supplies for use in performing medical services.

In the instant case there is no dispute that the hospitals engage in service activities within the meaning of section 448(d)(5).  Rather, the issue we must resolve is whether income attributable to medical supplies used in the course of performing those activities is ineligible for the nonaccrual-experience method of accounting merely because some part of the accounts receivable attributable to those medical supplies does not constitute income earned from the performance of services.

We find inapposite to the issue involved here the State law cases relied on by respondent.  The focus of those cases is on whether strict tort liability principles should be applied to hospitals.  Those cases are concerned with public policy considerations as to who should bear the loss from defective, though not negligent, services and/or products.  See McDaniel v. Baptist Memorial Hosp., 469 F.2d 230 (6th Cir. 1972); Johnson v. Sears, Roebuck & Co., 355 F. Supp. 1065 (E.D. Wis. 1973); cf.

Perlmutter v. Beth David Hosp., 308 N.Y. 100, 123 N.E.2d 792, 796 (1954) ("what the complaint alleges and truly describes is not a purchase and sale of a given quantity of blood, but a furnishing of blood to plaintiff for transfusion at a stated sum, as part of, and incidental to, her medical treatment").  Whether strict tort liability applies under the laws of a particular State is not determinative as to the issue at hand, which is whether, for purposes of section 448(d)(5), medical supplies are so connected to the performance of medical services that income attributable to the medical supplies constitutes income earned from the performance of those services.  We agree with petitioners that, for purposes of section 448(d)(5), medical supplies furnished in the course of rendering medical services are inseparably connected to the performance of those services and that income attributable to medical supplies therefore constitutes income earned from the performance of services within the meaning of that section.[18]

---

[18]  Our conclusion that income earned through the performance of services includes income relating to accounts receivable attributable to medical supplies used in the course of the diagnosis, prognosis, and treatment of the hospitals' patients is applicable in the instant case only for purposes of our construction of sec. 448(d)(5).  We do not decide in this opinion, as we did not decide in our prior Memorandum Opinion, Hosp. Corp. of America v. Commissioner, T.C. Memo. 1996-105, the question of whether the furnishing of medical supplies by petitioners' hospitals as a part of the rendering of services to their patients could be considered to be a sale of merchandise which must be inventoried pursuant to sec. 1.471-1, Income Tax

(continued...)

Medical supplies play a necessary and vital role in the diagnosis, prognosis, and treatment of the hospitals' patients. In many cases, medical services can not be rendered without using medical supplies. The furnishing of medical supplies by the hospitals is merely incidental to the main purpose of rendering health care services that a patient seeks when entering a hospital. The hospitals do not acquire medical supplies for sale to patients but rather to render medical services. Moreover, under current payment arrangements between the hospitals and public and private insurers, the hospitals' bills to patients generally bear no particular relationship to the amounts that the hospitals actually will be paid for the services provided.

Patients, furthermore, do not come to the hospitals to buy medical supplies; rather, they are there primarily to obtain a course of treatment. In many cases patients are not even aware of all of the medical supplies that are used in the course of the medical treatment. Patients generally are concerned with the treatment and healing processes and not with the medical supplies utilized by the hospitals in rendering medical treatment.

---

[18] (...continued)
Regs. Our conclusion here does not change the result in our prior Memorandum Opinion, given that for the years ended 1981 through 1986 petitioners' hospitals employed a hybrid method of accounting, not the cash method or an accrual method. Our holding applies equally to any accounts receivable attributable to medical supplies that are dispensed to employees or dependents of employees for their personal use.

Patients do not choose which or how many medical supplies will be used by the hospitals' staffs.  With a few exceptions, patients receive no tangible item that they did not have before the rendition of the medical services because the medical supplies generally are used and then discarded by the hospitals.  Patients, moreover, generally do not acquire any rights over the medical supplies used by the hospitals in the normal course of the hospitals' operations of providing health care services.  We conclude that for purposes of section 448(d)(5) the use of medical supplies is part of the medical services furnished patients and that the cost of those supplies is an incidental cost of the health care services provided by the hospitals.  See Potter v. James, 499 F. Supp. 607, 611 (M.D. Ala. 1980).

We find support for our conclusion in Abbott Labs. v. Portland Retail Druggists Association, 425 U.S. at 14-15.  In Abbott Labs. a group of commercial pharmacies brought suit under the Robinson-Patman Price Discrimination Act (Robinson-Patman Act), ch. 592, 49 Stat. 1526 (1936) (current version at 15 U.S.C. secs. 13-13(b), 21(a) (1994)),[19] against 12 manufacturers of pharmaceutical products, alleging that the manufacturers sold their products to hospitals at prices lower than the prices

---

[19]    The Robinson-Patman Price Discrimination Act (Robinson-Patman Act), ch. 592, 49 Stat. 1526 (1936) (current version at 15 U.S.C. secs. 13-13(b), 21(a) (1994)), generally made it illegal for a seller of merchandise to discriminate in price among different purchasers of like commodities.

charged commercial pharmacies for the same type of products.  The manufacturers countered that sales to the hospitals were exempt from the Robinson-Patman Act under the Nonprofit Institutions Act, ch. 283, 52 Stat. 446 (1938) (current version at 15 U.S.C. sec. 13(c) (1994)), which exempts from the application of the Robinson-Patman Act "purchases of their supplies for their own use by * * * hospitals and charitable institutions not operated for profit."  Accordingly, the issue in the Abbott Labs. case was whether the pharmaceutical products were sold to the hospitals for resale or for the hospitals' "own use".  The Supreme Court specifically recognized that the purchase of drugs for the treatment of a hospital's patients is a purchase for that hospital's "own use" because such use is part of and promotes the hospital's basic function of caring for patients.  Abbott Labs. v. Portland Retail Druggists Association, supra at 10, 14; see also St. Luke's Hosp. v. Commissioner, 35 T.C. at 238 (taxpayer hospital is "not a merchandising business and * * * [taxpayer] has no merchandise inventories which would require the use of an accrual method in keeping its books or reporting its income.  Its income is derived from providing hospital and professional care to the sick.").

We conclude from the foregoing that, for purposes of section 448(d)(5), income earned through the performance of services includes income relating to accounts receivable attributable to

medical supplies used in the course of the diagnosis, prognosis, or treatment of the hospitals' patients.  Cf. secs. 1.448-1T(e)(4), 1.448-2T(d), Temporary Income Tax Regs., 52 Fed. Reg. 22768, 22775 (June 16, 1987).  Therefore, no allocation of income between income attributable to the performance of services and income attributable to medical supplies is necessary in the instant case for the purpose of applying the nonaccrual-experience method of accounting.

Accordingly, we hold that petitioners' hospitals may utilize the nonaccrual-experience method of accounting for taxable years ended 1987 and 1988.  We hold further that the nonaccrual-experience method is applicable to income relating to accounts receivable attributable to medical services and accounts receivable attributable to medical supplies.

To reflect the foregoing,

<u>Appropriate orders</u>

<u>will be issued.</u>