Feeling Great, Inc. v. N.C. Dep't of Revenue, 2015 NCBC 81.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 11139

FEELING GREAT, INC.,
          Petitioner

      v.

N.C. DEPARTMENT OF REVENUE,
          Respondent
_____

SLEEP MEDICAL CENTER, INC.
          Petitioner

      v.

N.C. DEPARTMENT OF REVENUE,
          Respondent

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON PETITION FOR REVIEW
OF FINAL DECISION**

       THIS MATTER is before the Court on the Petition for Judicial Review of a Final Agency Decision in these consolidated contested tax cases pursuant to N.C. Gen. Stat. §§ 150B-43, -45, and -46 (hereinafter, references to the General Statutes will be to "G.S."). On June 4, 2015, the Court held a hearing on the Petition for Judicial Review.

> *The Law Office of David C. Franklin, PLLC by David C. Franklin, Esq. for Petitioners Feeling Great, Inc. and Sleep Medical Center, Inc.*

> *North Carolina Department of Justice by Perry J. Pelaez, Esq. for Respondent North Carolina Department of Revenue.*

McGuire, Judge.

<u>Procedural and Factual Background</u>

       1.     Feeling Great, Inc. ("Feeling Great") and Sleep Medical, Inc. ("Sleep Medical," together with Feeling Great, "Petitioners") are North Carolina corporations with their principal places of business in Durham, North Carolina. Petitioners are both owned and operated by Sandra Wrightenberry and Jerry Wrightenberry. Feeling Great was

incorporated in 2001 as a durable medical equipment and medical supply company, and in 2003 opened a sleep study testing facility. In 2007, the testing business was separated from the medical equipment and supply sales business and Sleep Medical was incorporated to perform all sleep study testing. After Sleep Medical was incorporated, Feeling Great's primary purpose was selling durable medical equipment.

2.      The testing performed by Petitioners is prescribed by a patient's physician or other healthcare provider. The testing itself is conducted on a prescription or a certificate of medical necessity issued by the physician. Petitioners perform sleep study testing using the Alice Diagnostic Sleep System.[1] The testing performed by the Alice equipment requires the use of a number of supplies such as cleaners, sensors, scissors, exam gloves, gauze tape, Q-Tips, disinfectant, and batteries.[2] Petitioners did not maintain a standing inventory of these supplies. Instead, the supplies were ordered on a weekly basis as needed to perform the testing scheduled for the following week. The specific supplies ordered depended on the nature of the testing to be performed.[3]  Petitioners purchased the supplies required to perform the sleep testing from MVAP Medical Supplies, Inc. ("MVAP"), a vendor in California.  MVAP shipped the supplies to Petitioners in North Carolina.

3.      The prescription for the sleep testing does not entitle the patient to purchase the supplies directly from Petitioners. Instead, the supplies at issue are dispensed to the patient in such amount as needed for their testing. The supplies used during the sleep testing are entirely consumed during the testing procedure and are not available to be used in subsequent testing.

---

[1] The Alice equipment is not sold to the patient. *See* Transcript of Record (hereinafter, "Tr.") 136.
[2] A full list of the supplies at issue is found at Respondent's Exs. 11-12.
[3] *See* Transcript of OAH Proceeding 79; Final Decision, Findings of Fact ¶ 2.

4.      Petitioners bill patients for the testing in a single, lump sum amount. The invoices sent by Petitioners do not itemize the individual supplies involved in performing the testing or otherwise differentiate between the cost of the testing and the cost of the supplies. Instead, Petitioner's invoices generally contain a single billing code to cover each test performed.[4] The testing performed by Petitioners is covered under both the Medicare and Medicaid programs.

5.      Petitioners provide the test results to the patient's physician for diagnosis. If diagnosed with a sleep related medical condition, such as sleep apnea, the patient often is given a prescription to purchase durable medical equipment (such as a CPAP machine) and related supplies to aid in treatment of that condition.[5]

6.      The North Carolina Department of Revenue ("Department" or "Respondent") audited Feeling Great for North Carolina sales and use tax for the period July 1, 2004, through June 30, 2010.  The Department found that Feeling Great failed to accrue and remit use tax on its purchases of supplies from MVAP used in the testing of patients. The Department assessed Feeling Great for additional use tax of $10,280.42, interest of $2,714.33, and penalties of $6,168.25.

7.      The Department audited Sleep Medical for North Carolina sales and use tax for the period January 1, 2008, through April 30, 2010.  The Department found that Sleep Medical failed to accrue and remit use tax on its purchases of supplies from MVAP used in the testing of patients. The Department assessed Sleep Medical for additional use tax of $5,567.96, interest of $853.17, and penalties of $3,340.80.

---

[4] Final Decision, Findings of Fact ¶ 3. *See also* Respondent Ex. 6.
[5] The patient may purchase the prescribed durable medical equipment and supplies from Feeling Great.  The sales of the durable equipment and supplies directly to the patient on these prescriptions are not at issue in this case.

8.     In its Notices of Final Determination, the Department concluded that the supplies at issue were not exempt from North Carolina's use tax because they were not sold or dispensed to patients on prescription. The Department further noted that Petitioners did not bill their patients for the items used in conducting the sleep study tests, but instead billed a lump sum for the sleep study test.[6]

9.     On September 24, 2013, Petitioners filed their contested case proceedings before the Office of Administrative Hearings.[7] Petitioners contend that the supplies at issue are exempt from use tax under G.S. § 105-164.13(12)d because they are "durable medical supplies sold on prescription" (the "Exemption"). On July 23, 2014, Administrative Law Judge J. Randolph Ward ("ALJ Ward") issued a Final Decision ("Final Decision") concluding that the supplies at issue were exempt from use tax under G.S. § 105-164.13(12)d. ALJ Ward concluded that the "[s]upplies purchased and used by Petitioners with durable medical equipment in performing diagnostic studies, pursuant to physicians' Certificates of Medical Necessity . . . are exempted from use taxes by the terms of" G.S. § 105-164.13(12)d.[8]

10.     On August 22, 2014, the Department filed its Petition for Judicial Review of the Final Decision pursuant to G.S. §§ 150B-43, -45, and -46. In its Petition, the Department takes exception to a number of findings of fact and conclusions of law contained in the Final Decision and contends that the supplies at issue here were not exempt from use tax under G.S. § 105-164.13(12)d. The Petition has been fully briefed and, on June 4, 2015, the Court held a hearing on the Petition.

---

[6] *See* Notices of Final Determination, Respondent Exs. 9-10.
[7] Petitioners' contested case proceedings were consolidated by OAH on November 16, 2013.
[8] Final Decision, Conclusion of Law 6.

<u>Standard of Review</u>

11.     "In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record." G.S. § 150B-51(c). In addressing asserted errors of law, unlawful procedure, or whether the final decision exceeded the statutory, jurisdictional, or constitutional authority of the agency or administrative law judge, the Court is to apply the *de novo* standard of review. *Id.* "De novo review requires a court to consider a question anew, as if not considered or decided by the agency previously . . . ." *Smith v. Richmond Cnty. Bd. of Educ.*, 150 N.C. App. 291, 295 (2002). Under this standard of review, the Court "freely substitutes its own judgment for the agency's." *N.C. Dept. of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 658 (2004).

12.     Alternatively, with regard to contentions that the final decision is unsupported by substantial evidence or that the final decision is arbitrary, capricious, or an abuse of discretion, the Court is to apply the whole record standard of review. G.S. § 150B-51(c). Unlike the de novo standard of review, the Court does not substitute its judgment for the agency's. Instead, the whole record standard of review "gives the reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *Bennett v. Hertford Cnty Bd. of Educ.*, 69 N.C. App. 615, 618 (1984) (internal quotations and citations omitted). This standard requires the Court to examine all competent evidence, and the administrative findings of fact, if supported by substantial evidence, are binding. *Farber v. N.C. Psychology Bd.*, 153 N.C. App. 1, 14 (2002). "Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.C. Dep't of Crime Control & Pub. Safety v. Greene*, 172 N.C. App. 530, 534 (2005) (internal citations omitted). Under the whole record test, if it is determined that the ALJ's findings of fact are not supported by substantial evidence, "the trial court may make

its own findings of fact that may be at variance with those of the agency." *Id.* (internal citations omitted).

13.     "The reviewing court may be required to utilize both standards of review if warranted by the nature of the issues raised." *MW Clearing & Grading v. N.C. Dep't of Env't & Natural Res.*, 171 N.C. App. 170, 173 (2005) (internal citations omitted).

<u>Discussion</u>

14.     In their Petition for Judicial Review, the Department argues that the Final Decision contained findings of fact that were not supported by substantial evidence in the record and also contained errors of law. The Court will first address the Department's exceptions to the ALJ's findings of fact, followed by the asserted errors of law.

a.   *Exceptions to the ALJ's Findings of Fact*

15.     The Department asserts several exceptions to the ALJ's factual findings in the Final Decision. As noted above, the Court reviews challenges to findings of fact under the whole record standard of review to determine if the findings are supported by substantial evidence.

16.     The Department first asserts what appears to be a general objection to the Final Decision based on the Department's contention that the ALJ failed to comply with the terms of G.S. § 150B-34(a). This statute requires an ALJ to render "a final decision or order that contains findings of fact and conclusions of law." The Department contends that the Final Decision's Findings of Fact are incomplete, specifically arguing that the ALJ made no specific finding that the supplies at issue were ever "sold."[9] However, because the Court's ability to review the Final Decision is not limited to express findings and conclusions, but includes the inferences contained in the Final Decision, *see* G.S. § 150B-51(b), and because

---

[9] Respondent's Br. Supp. Petition for Judicial Review 11.

the Final Decision technically complies with the mandate to make findings of fact and conclusions of law, the Court rejects this argument. Instead, the Court addresses the Department's exceptions to specific findings of fact.

17. The Department contends that Finding of Fact 5 is unsupported by the record evidence and is improperly based on the ALJ's consideration of factual information outside of the record. Finding of Fact 5 relies on an internet website hosted by the federal Centers for Medicare and Medicaid Services and relates to the "unbundling" of medical procedure codes to increase the cost of the overall medical services provided.[10] The Department argues that the ALJ improperly took judicial notice of this website. Under Rule 201 of the North Carolina Rules of Evidence,[11] a court may, upon a motion by a party or on its own motion, take judicial notice of any fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Department's sole assertion of error is that an internet website is not a source of indisputable accuracy. However, courts in North Carolina have concluded that, in a proper case, judicial notice may be taken of information available on a website. *See, e.g., LegalZoom.com, Inc. v. N.C. State Bar*, 2014 NCBC LEXIS 9, *4 (N.C. Super. Ct. Mar. 24, 2014). The Department makes no argument as to why the specific website referenced is not of indisputable accuracy, nor does the Department take issue with the contents of the cited provisions. Without offering any explanation as to why the specific website at issue does not qualify for judicial notice, the Department's exception to that Finding of Fact fails.

---

[10] The Court notes that, although the website at issue was not discussed during testimony, Sandra Wrightenberry did testify on the topic of unbundling, and the prohibition of the practice by Medicaid. Tr. 92.

[11] The North Carolina Rules of Evidence are applicable in proceedings before an ALJ pursuant to G.S. § 150B-29(a).

18.     The Department next argues that Finding of Fact 10 is unsupported by substantial evidence in the record. In Finding of Fact 10, ALJ Ward found that "Medicaid routinely authorizes the purchase of durable medical equipment and associated 'supplies' under a single prescription."[12]    There was, however, no testimony or other evidence introduced into the record that supports the finding that this type of authorization is a routine Medicaid practice. Instead, in support of this finding, the ALJ cited *Mazer v. N.C. Department of Health and Human Services*, 12 DHR 01733, 2012 NC OAH LEXIS 135 (2012). *Mazer*, however, did not hold that Medicaid routinely authorizes the purchase of durable medical equipment and supplies under a single prescription. Instead, that case concerned whether the sale of a wheelchair was "on prescription," and thus tax exempt, where the recipient had a signed Certificate of Medical Necessity and Prior Approval Form for Durable Medical Equipment and Prosthetic Supplies to acquire the equipment. *Id.* The ALJ in that case concluded that, given the physician's documented prior authorization to purchase the wheelchair, the petitioner complied with the applicable statutory provisions and a prescription in that case was not an absolute necessity. *Id.*

19.     Here, the record fails to show that the ALJ's finding was supported by substantial evidence. The prescriptions to conduct sleep study testing did not expressly prescribe the supplies to be used in the testing. The prescription contained only the specific sleep testing the physician wanted Petitioners to perform, the reason for the testing, and in many cases a preliminary diagnosis of sleep apnea or other similar condition.[13] The prescriptions in the record do not include any reference to the purchase of any medical equipment or supplies.

---

[12] The apparent inference from this finding is that the prescriptions received by Petitioners provided both for the purchase of the service, the sleep study testing, and the associated supplies.
[13] *See, e.g.,* Respondent's Ex. 2.

20.     Exhibit 5 to Respondent's Brief in Support of its Petition for Judicial Review clearly illustrates this distinction.[14] The first document in that exhibit is a prescription dated October 7, 2010, in which the physician, Dr. Ojebuoboh, prescribed sleep study testing for the patient. The only information provided is the type of sleep testing to be performed and the reason for the testing. The prescription does not prescribe or make reference to the equipment or supplies needed to conduct the testing.  By contrast, after Petitioner performed the testing and provided the results to Dr. Ojebuoboh, the same patient was given a second prescription specifically prescribing the purchase of a CPAP machine and "all supplies as needed" to operate and use the machine. The second prescription clearly contemplated the purchase of supplies by the patient, and those supplies were specifically prescribed by the physician. The sale of such supplies to the patient would unquestionably be "on prescription." By contrast, the sleep study prescription, on its face, does not contemplate the sale of any supplies to the patient, but only that the testing be performed.

21.     Ultimately, the Court concludes that the finding that "Medicaid routinely authorizes the purchase of durable medical equipment and associated 'supplies' under a single prescription," as well as the inference that the prescriptions here prescribed the purchase of the supplies in addition to sleep study testing, are unsupported by substantial evidence in the record. Accordingly, pursuant to its authority to make findings of fact at variance with those not supported by substantial evidence, *see Greene*, 172 N.C. App. at 534, the Court finds that the prescriptions to conduct sleep study testing do not contemplate the sale of the supplies at issue to patients in connection with the prescribed testing.

22.     The Department next challenges Finding of Fact 11. The Department contends that Finding of Fact 11 interprets G.S. § 105-164.13(12)d and is a conclusion of law, not a

---

[14] This exhibit is also Exhibit 5 in the record before the ALJ.

finding of fact. The Court agrees and will address the interpretation of G.S. § 105-164.13(12)d below pursuant to its de novo review of the asserted errors of law. *See In re Foreclosure by David A. Simpson, P.C.*, 211 N.C. App. 483, 487 (2011) (reclassifying findings of fact "that required the application of legal principles and [were] more appropriately classified as conclusions of law").

23. Finally, the Department argues that Finding of Fact 8, addressing the legislative history of the Exemption, is irrelevant to the ultimate disposition of this matter as the ALJ concluded that the Exemption was "unambiguous." The Department contends that the "fundamental rules of statutory interpretation dictate that the legislative history" of this section is irrelevant based on the ALJ's conclusion that the language of the Exemption is unambiguous.[15] As with Finding of Fact 11, this appears to the Court to assert an error of law, the allegedly improper interpretation of G.S. § 105-164.13(12)d, and will be addressed below.

b. *Asserted Errors of Law*

24. In addition to the asserted factual issues, the Department contends that the ALJ erred as a matter of law in interpreting the scope of the exemption in G.S. § 105-164.13(12)d, and in concluding, based on that interpretation, that the Exemption covered the supplies at issue. Because the Department argues that the ALJ's conclusions of law are affected by error of law, the Court reviews this challenge under the de novo standard of review.

25. North Carolina law imposes two related taxes on the purchase of tangible personal property: a sales tax, imposed on a retailer "for the right to engage in that business," *In re Assessment of Add'l N.C. & Orange Cnty. Use Taxes*, 312 N.C. 211, 214 (1984); and a

---

[15] Respondent's Br. Supp. Petition for Judicial Review 19.

use tax, imposed on a purchaser of property from outside the State for storage, use, or consumption in this State. *Colonial Pipeline Co. v. Clayton*, 275 N.C. 215, 222 (1969). The purpose of the use tax is to equalize the tax burden on all state residents by imposing the same burdens on out-of-state purchases as that imposed on purchases made within the State. *In re Assessment of Add'l N.C. & Orange Cnty. Use Taxes*, 312 N.C. at 214. In the case of the use tax, the taxable event is when possession of property is transferred to the purchaser within the taxing state for storage, use, or consumption. G.S. § 105-164.6(a)(1) (2011). *See also Colonial Pipeline Co.*, 275 N.C. at 222.

26.    State law, however, provides a number of exemptions from both the sales tax and the use tax. One such exemption is contained in G.S. § 105-164.13(12)d, which exempts from sales and use tax the sale of "[d]urable medical supplies sold *on prescription*." (emphasis added).  As it relates to this section and the tax years at issue, "sale" is defined as the "transfer for consideration of title or possession of tangible personal property or the performance for consideration of a service." G.S. § 105-164.3(36) (2011).[16] Durable medical supplies are defined as "[s]upplies related to use with durable medical equipment that are eligible to be covered under the Medicare or Medicaid program." G.S. § 105-164.3(8c) (2011). Durable medical equipment, in turn, is equipment, excluding repair and replacement parts, that can withstand repeated use, is primarily and customarily used to serve a medical purpose, is generally not useful absent an illness or injury, and is not worn on the body. G.S. § 105-164.3(8b) (2011).

---

[16] In opposing the Petition for Judicial Review, Petitioners cite the incorrect definition of sale under G.S. § 105-164.3(36). Effective June 26, 2012, the definition of "sale" was amended to the version currently in effect. This current definition includes the "transfer of consideration of title, *license to use or consume*, or possession of tangible personal property . . . ." *See* Session Laws 2012-79 (emphasis added). The version in effect during the tax years at issue is quoted above.

27.     Petitioners purchased the supplies at issue from MVAP, a California retailer. The supplies at issue consist of tangible personal property. Those supplies were stored, used, or consumed in the State of North Carolina in the course of performing sleep study testing. Accordingly, absent the applicability of some exemption, the supplies purchased from MVAP were subject to use tax in North Carolina. G.S. § 105-164.6(a)(1) (2011). *See also Colonial Pipeline*, 275 N.C. at 222.

28.     Turning to the Exemption, the Court concludes, and the parties do not appear to dispute, that the supplies at issue constitute "durable medical supplies," as that term is defined in G.S. § 105-164.3(8c). These supplies are used with durable medical equipment, the Alice Diagnostic Sleep System, in the course of performing testing on patients. Nevertheless, although they constitute durable medical supplies, the Exemption will only apply if the supplies at issue were sold by Petitioners on prescription.

29.     A sale, as it was defined by the statute in effect during the tax years at issue, requires a transfer of title or possession for consideration. G.S. § 105-164.3(36) (2011). *See also Technocom Bus. Sys. v. N.C. Dep't of Revenue*, 219 N.C. App. 207, 213 (2012). While the record and the Final Decision clearly indicate that the supplies at issue were used in the course of conducting sleep diagnostic testing, nothing suggests that the possession or title of the supplies at issue was transferred to the patient in the course of the testing performed by Petitioners.

30.     As an initial matter, Petitioners do not send their patients an itemized invoice that sets out the costs of the supplies used during testing, or that distinguish between the cost of the supplies and the cost of the testing services rendered. Similarly, nothing in the record or the Final Decision indicates that Petitioners kept any internal record segregating the cost of testing from the cost of supplies used in connection with the testing. Accordingly, it is undisputed that there was no "sale" of the supplies at issue separate from the

performance of sleep study testing.[17] Instead, Petitioners argue that the sale of the medical testing itself necessarily includes the sale of the supplies used during testing. The Court disagrees.

31.     While Sandra Wrightenberry testified, and ALJ Ward found, that the supplies at issue were consumed during the testing procedure,[18] she also testified that those supplies are used and applied by Petitioners during the testing.[19] These supplies are not given to patients for home use, and a patient cannot walk into one of Petitioners' facilities and purchase the supplies at issue.[20] Wrightenberry testified that some patients might leave Petitioners' facility with some supplies, including EKG and EEG pads, still on their person, but admitted that the only reason they would do so is that they preferred to remove those pads in the privacy of their home and not at Petitioners' facility.[21] Ultimately, as the ALJ found, these supplies, including any that might leave the facility, cannot be used again after the testing is completed.[22]

32.     It is apparent that all or nearly all of the supplies at issue are single-use, disposable items and that their sole value lies in their use in connection with sleep study testing. Possession and control of the supplies never passes to the patient, and any benefit from the supplies inures to the patient during the testing. To the extent patients provide any consideration for these supplies, they do so for the use of the supplies only in connection with the testing services provided by Petitioners.[23] As the Department notes, however, for the tax

---

[17] *See* Final Decision, Findings of Fact ¶ 3.
[18] Final Decision, Findings of Fact ¶ 3; Tr. 78.
[19] *Id.* at 138.
[20] *See id.* at 196.
[21] *Id.* at 141.
[22] *Id.*; Final Decision, Findings of Fact ¶ 3.
[23] By contrast, when a patient purchases a CPAP machine and related supplies after receiving a prescription to do so following a proper diagnosis, the patient clearly provides consideration for the transfer of title and/or possession of the equipment and supplies, not merely its use.

years at issue, "license to use or consume" was not included in the definition of "sale."[24] While the record and Final Decision are full of references to the fact that these supplies were used[25] or consumed[26] in connection with the testing performed by Petitioners, mere use, even if for consideration, is not a sale under the appropriate statutory definition. The record evidence and the ALJ's Findings of Fact do not establish that there was ever a transfer of title or possession of the supplies at issue, or that patients otherwise exercised any dominion and control associated with a transfer of title or possession of the supplies.[27]

33.     Moreover, Petitioners' own internal procedures manual referenced by the ALJ[28] recognizes that the supplies used during testing are not sold to patients and patients are not permitted to leave the facility with supplies. Sleep Medical Center's Policies & Procedures Manual, prepared under the direction of Sandra or Jerry Wrightenberry,[29] specifically provides as follows.

- **Supplies** – All supplies used to perform sleep studies are based on the patient's sleep study prescription (certificate of medical necessity), whether over-the-counter items or prescription only items.

- **Federal Law** – Federal law does not permit *any devices or supplies used during the sleep study to be given or sold to the patient.*[30]

Whether an accurate statement of federal law or not, it is clear that Sleep Medical Center did not consider itself to be selling the supplies used during the testing to patients. This prohibition is not limited to barring supplies from being sold or given without a

---

[24] *See, supra*, n. 16.
[25] Tr. 110 (supplies are "used by the patient").
[26] *Id.* at 78 (patients "consume 100 percent" of supplies). *See also* Final Decision, Findings of Fact ¶ 3.
[27] *See* Tr. at 138 (noting that supplies were used and administered by a sleep technician). *See also* Final Decision, Findings of Fact ¶ 2 (noting that the Petitioners' medical personnel "conduct the tests . . . including the utilization of consumable supplies . . . .").
[28] *See* Final Decision, Findings of Fact ¶ 2 (recognizing that sleep study testing is governed by Sleep Medical's internal procedures manual).
[29] Tr. at 172.
[30] Respondent's Ex. 7 (emphasis added).

prescription. Instead, this policy, by its plain language, indicates that, although determined by the patient's prescription, any supplies used in connection with testing are not permitted to be given or sold to the patient.

34.     In support of their contention that the supplies at issue are sold to patients, Petitioners direct the Court to G.S. § 105-164.3(36)b, which notes that the term "sale" includes "[f]urnishing or preparing tangible personal property consumed on the premises of the person furnishing or preparing the property or consumed at the place at which the property is furnished or prepared." This provision would still require the relinquishment of some degree of dominion and control, or, at a minimum, a transfer of possession, such that the supplies are given to the patient.[31] Even this provision requires more than mere use incidental to providing sleep study testing. Such incidental use does not constitute a sale of the supplies under G.S. § 105-164.3(36).

35.     Finally, G.S. § 105-164.13(12)d requires that the supplies be "sold *on prescription*." In other words, the supplies at issue must be prescribed by a physician or other appropriate medical care provider. As discussed above, the Court has found, pursuant to its authority in *Greene*, 172 N.C. App. at 534, that the supplies at issue were not prescribed by a physician. The prescriptions do not reference the supplies to be used in the testing.[32] By contrast, once testing is completed and a physician makes a diagnosis, the physician may prescribe for the patient specific equipment and supplies for home use. Unlike prescriptions for testing, these prescriptions clearly and specifically prescribe a sale of equipment and supplies.

---

[31]*See Furnish Definition*, Merriam-Webster, www.merriam-webster.com/dictionary/furnish (last visited Aug. 20, 2015).
[32] *See* Respondent's Ex. 2.

36.     Petitioners contend that physicians know that supplies will be used in and are required to perform the prescribed sleep testing. Petitioners argue that prescribing a certain test necessarily includes prescribing the supplies to perform that test. The United States Tax Court, however, has recognized that, although a necessary part of providing medical care, the "furnishing of medical supplies by [medical providers] is merely incidental to the main purpose of rendering" healthcare services. *Hosp. Corp. of Am. v. Comm'r*, 107 T.C. 116, 144 (1996). "Patients, therefore, do not come to [a medical care provider] to buy medical supplies; rather, they are there primarily to obtain a course of treatment." *Id.* Here, the Court finds *Hospital Corporation of America* persuasive. Patients come to Petitioners for the performance of sleep study testing so that their physician can diagnose an ongoing health concern. Patients are not there to fill a prescription for supplies such as batteries, exam gloves, scissors, or gauze tape. Instead, patients are prescribed, and are subsequently billed for, a specific type of testing. While unquestionably necessary, these supplies are simply incidental to the prescribed testing.

37.     Accordingly, the Court concludes that, even if the supplies at issue were sold to patients, they were not sold "on prescription." Instead, the prescription covered only the testing performed and, although necessary to performing that testing, the use of the supplies at issue were merely incidental to that testing. *See id.*

38.     Ultimately, although the ALJ found that the supplies at issue were used in connection with Petitioners' sleep study testing, the definition of "sale" in effect during the tax years at issue required more than mere use. After reviewing the statutory definition of "sale" in effect during the tax years at issue, the Court concludes that Petitioners did not sell the supplies at issue to patients. Moreover, as noted above, even assuming that a sale took place, the sale was not "on prescription," as required by the Exemption. Therefore, the Court concludes that the ALJ erred as a matter of law in its interpretation of the Exemption. Upon

a de novo review of that decision, the Court concludes that the purchase of the supplies at issue was not exempt from use tax under G.S. § 105-164.13(12)d (2011).

## Conclusion

39.     The Court concludes that the Final Decision entered in this matter contains errors of law and findings of fact unsupported by substantial evidence. For the foregoing reasons, the Court REVERSES the Final Decision entered in these consolidated cases on July 23, 2014.

IT IS SO ORDERED, this the 20th day of August, 2015.


  /s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
  for Complex Business Cases